# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGILIO MALDONADO, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-2984 |
| | § | |
| RICK THALER,[1] | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Virgilio Maldonado ("Maldonado"), a Texas inmate incarcerated under a sentence of death, petitions for habeas corpus relief. (Doc. # 1). A jury convicted Maldonado for committing the capital murder of Cruz C. Saucedo during a robbery. After a separate punishment hearing, the same jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence. After availing himself of Texas' appellate and post-conviction remedies, Maldonado now seeks federal habeas relief from his conviction and sentence pursuant to 28 U.S.C. § 2254.

This action comes before the Court on Respondent Rick Thaler's Motion for Summary Judgment. (Doc. # 17). The parties have extensively briefed the issues raised by Maldonado's habeas petition. The Court has thoroughly reviewed the record

---

[1] On July 15, 2009, Rick Thaler replaced Nathaniel Quarterman as the Director of Texas Department of Justice-Correctional Institutions Division. Accordingly, Thaler "is automatically substituted as a party." FED. R. CIV. P. 25(d)(1).

in this case, including the state court pretrial, trial, appellate, and habeas proceedings.

Based on this review of the record and the application of governing legal authorities,

with special consideration given to the Anti-Terrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), the Court grants Respondent's summary judgment motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On direct appeal, the Texas Court of Criminal Appeals summarized the trial

evidence relating to the victim's murder:

> On Friday, November 11, 1995, after an evening playing volleyball, Augustin Saucedo dropped his father, Cruz Saucedo, off at his apartment.  Augustin tried to contact his father that weekend, but received no response when he paged him (his father did not have a phone, only a pager).  On the following Tuesday, when Augustin still had not heard from his father, he contacted his sisters, Paula and Hericelda, who lived in the same apartment complex as their father. Paula provided Augustin with a key to their father's apartment and accompanied him to the apartment.  Augustin then discovered the decomposing body of his father lying on the kitchen floor.
>
> Cruz Saucedo's hands had been bound with the electric cord of a Black & Decker iron and he had been shot twice in the head with a .45-caliber semi-automatic weapon.  The police discovered four bricks of marijuana hidden in the apartment and recovered a pillow with two bullet holes soaked with "body fluids."  Augustin noticed his father was not wearing a necklace he normally wore.  Also, investigators found several cans of air freshener in the apartment, which Augustin had not noticed before his father's death.  Investigators deduced the air freshener indicated someone stayed in the apartment for a period of time after the victim's death and sought to mask the stench of decay.

*Maldonado v. State*, 998 S.W.2d 239, 242-43 (Tex. Crim. App. 1999) (footnotes

omitted).

2

The police had no leads in Mr. Saucedo's murder for some time.  Several months later, the police arrested Maldonado for an unrelated bank robbery.  While Maldonado was in custody, the police received information that he had been involved in the Saucedo murder.  The police informed Maldonado of his constitutional rights and interrogated him.  Maldonado confessed to the killing.  The Court of Criminal Appeals described the circumstances surrounding Maldonado's interrogation and his subsequent confession:

> On April 24th . . . the police "received information" implicating [Maldonado] in this homicide. Officer Jaime Escalante went to the Harris County Jail to interview [Maldonado] who was incarcerated on unrelated charges.  Escalante read [Maldonado] his *Miranda* rights in Spanish. [Maldonado] was talkative, but refused to discuss the instant offense. He asked Escalante to come back the next day and he would think about giving him a statement.  Escalante returned the following day and, after he read [Maldonado] his constitutional rights again, [Maldonado] gave a tape recorded statement admitting his participation in this offense and others.
>
> In the recorded statement, [Maldonado] admitted entering the victim's apartment with another man named Felix or Benito, while a third man, Adan, waited in the car.  [Maldonado] was carrying a .45-caliber pistol. They went to the apartment because Felix wanted to borrow a "cuerno" (AK-47).  [Maldonado] also asked the victim to loan them a pistol. When the victim refused to give them a "cuerno" or a pistol, Felix bound the victim with the cord of the iron in the kitchen.  [Maldonado] and Felix then demanded to know where the pistol was and also demanded to know the location of some marijuana they believed the victim had in his possession.  The victim told them the marijuana was under the bed and the pistol was in the vacuum cleaner. Felix retrieved these items, then told [Maldonado] to kill the victim.  [Maldonado] remembered shooting the victim three times in the head, using a pillow to muffle the sound.  [Maldonado] noted that Felix was giving the orders and Felix

3

took the marijuana out to the car.

*Maldonado*, 998 S.W.2d at 242-43.[2]

The State of Texas charged Maldonado with capital murder committed during the course of a robbery.  Cruz Cervantes and John Derringer (collectively "trial counsel") represented Maldonado at trial.  A jury convicted Maldonado of capital murder.  A separate punishment hearing resulted in a death sentence.

Maldonado filed an automatic direct appeal with the Texas Court of Criminal Appeals.  Maldonado's trial counsel, Cruz Cervantes, represented him on appeal.  On direct appeal, Maldonado raised several points of error.[3]  The Court of Criminal Appeals found that Maldonado preserved error with regard to each appellate claim,

---

[2]  The state court proceedings in this case resulted in a voluminous record.  The Court will cite the Clerk's Record containing trial court motions and docket entries as Trans. at ___.  The reporter's record containing the trial court proceedings will be cited as Tr. Vol. ___ at ___.  The Court will refer to the Court of Criminal Appeals' opinion on direct review by the published citation.  The Court will refer to the record from Maldonado's initial state habeas proceedings as State Habeas Record at ___.  Maldonado's successive habeas proceedings resulted in two sets of records: the record of the hearings will be cited as S.H.R. Vol. ___ at ___ and the transcript of pleadings, exhibits, and other documents will be cited as S.H. at ___.

[3]  Because Respondent argues that Maldonado did not present many of his claims in a way that allowed for full state court review, the Court will identify the claims that Maldonado raised at each stage of the proceedings.  Maldonado raised the following claims on direct appeal: the evidence was legally and factually insufficient to show that he committed murder during the course of a robbery; the trial court should have suppressed the audio recording of his statement because of errors in the recording; the trial court should have instructed the jury to disregard his confession if the audio recording was not accurate or he had not received notification of his right to assistance from the Mexican Consulate; the trial court should have suppressed Maldonado's confession as involuntary and coerced because Officer Escalante promised leniency in return for his statement; and the trial court should have removed four jurors for cause.

considered their merits, and affirmed his conviction and sentence.  *See Maldonado*, 998 S.W.2d at 242-43.  Maldonado did not file a petition for a writ of certiorari in the United States Supreme Court.

Maldonado filed his first application for a writ of habeas corpus during the pendency of his direct appeal.[4]  Of particular importance to the instant proceedings, the state habeas court procedurally barred Maldonado's claims based on the Sixth Amendment right to counsel and international law.  The state habeas court, however, alternatively denied relief on all claims.  *Ex parte Maldonado*, No. 51,612-01 (Tex. Crim. App 2002).

Maldonado then initiated federal habeas proceedings.  *Maldonado v. Cockrell*, No. H-03-CV-811 (S.D. Tex.).  Through appointed counsel, Maldonado filed a federal habeas petition that contained several claims which he had not presented to the state courts.  As this Court will discuss at length later, the Court dismissed Maldonado's initial federal petition without prejudice to allow for the exhaustion of state remedies.

Maldonado in turn filed a second state habeas application in the Court of Criminal Appeals.  *Ex parte Maldonado*, No. 51,612-02 (Tex. Crim. App).  Maldonado's second habeas application raised three main claims: (1) mental

---

[4]     Maldonado's first habeas application raised the following claims: the State violated his right to consular access under the Vienna Convention; the police took his custodial statement in violation of his Sixth Amendment right to counsel; the trial court should have instructed the jury on the parole eligibility that accompanied a life sentence in Texas; and trial counsel provided ineffective assistance by not preserving error on the parole-eligibility issue.

retardation precludes his execution under *Atkins v. Virginia*, 536 U.S. 304 (2002); (2) the police violated his Fifth Amendment rights by interviewing him while he had counsel appointed on a separate criminal charge; and (3) trial counsel provided ineffective assistance at both the guilt/innocence and penalty phases, particularly by not investigating his mental retardation and not presenting additional mitigating evidence.  The Court of Criminal Appeals found that Maldonado only met the state law requirements for filing a successive application with respect to his *Atkins* claim. The Court of Criminal Appeals dismissed Maldonado's other claims under its abuse-of-the-writ doctrine because he should have raised them earlier.   The Court of Criminal Appeals remanded Maldonado's *Atkins* claim to the trial court.  The lower court allowed briefing, heard oral argument, and held an evidentiary hearing.  The lower court issued comprehensive proposed findings and conclusions recommending that the Court of Criminal Appeals deny habeas relief.  The Court of Criminal Appeals adopted the lower court findings and denied Maldonado's *Atkins* claim.

During the pendency of Maldonado's second habeas action, he filed a third habeas application in state court that again alleged that his conviction and sentence violated international law.  *Ex parte Maldonado*, No. 51,612-03 (Tex. Crim. App). The Court of Criminal Appeals dismissed Maldonado's third application as an abuse of the writ.

Maldonado returned to federal court.  The Court summarizes the grounds for

6

relief he raises in his amended federal habeas petition as follows:

1.  Mental retardation precludes Maldonado's execution.

2.  Maldonado's conviction and sentence are infirm because the State did not give adequate notice of his right to consular assistance under the Vienna Convention on Consular Relations.

3.  The State violated the Fifth Amendment by interrogating Maldonado after he invoked his right to counsel.

4.  Repeated interrogations by police officers outside the presence of counsel violated Maldonado's Sixth Amendment rights.

5.  Trial counsel provided ineffective representation by failing to present additional mitigating evidence, discover his mental retardation, and act on his consular rights.

6.  The State withheld evidence, including that of complaints made against the officer who interrogated Maldonado.

7.  The Court of Criminal Appeals violated Maldonado's federal constitutional rights by relying on unreliable and unscientific testimony when denying his *Atkins* claim.[5]

Respondent has moved for summary judgment.  (Doc. # 17).  Respondent argues that procedural law forecloses federal review of Maldonado's entire petition because he did not file in a timely manner.  Also, Respondent argues that the operation of state procedural law prevents federal consideration of several claims.  Alternatively,

---

[5]   Maldonado's petition also lists as a ground for habeas relief that he "was represented by the same ineffective counsel at both his criminal trial and direct appeal, in flagrant violation of his Sixth Amendment right to effective assistance of counsel."  (Doc. # 11 at 6).  As Maldonado's briefing does not elaborate on this unexhausted claim, the Court will summarily deny relief on that basis.

Respondent asserts that all Maldonado's federal habeas claims lack merit.  Maldonado has responded to the summary judgment motion.  (Doc. # 18).  Maldonado's federal habeas petition is ripe for adjudication.

## LEGAL STANDARDS

The Constitution honors the writ of habeas corpus as "a vital instrument for the protection of individual liberty[.]"  *Boumediene v. Bush*, ___ U.S. ___, 128 S. Ct. 2229, 2246 (2008).  Federal courts and Congress, however, "adjust the scope of the writ in accordance with equitable and prudential considerations."  *Danforth v. Minnesota*, ___ U.S. ___, 128 S. Ct. 1029, 1040 (2008).  Congress has limited the contours of federal habeas jurisdiction to "violation[s] of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Habeas law, however, balances an inmate's constitutional rights against the State's interest in preserving the integrity of a jury verdict. *See* B*arefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials."); *Moore v. Dempsey*, 261 U.S. 86, 87-88 (1923) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved.").  Through statutory law and jurisprudential limitations, federal habeas proceedings honor the "presumption of finality and legality [that] attaches to [a petitioner's]

conviction and sentence."  *Barefoot*,  463 U.S. at 887.

### The AEDPA

The AEDPA gives effect to many traditional limits on federal habeas review. Most notably, a deferential review of state court judgments exists "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Garceau*, 538 U.S. 202, 206 (2003) ("Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases and to further the principles of comity, finality, and federalism[.]").  To that end, the AEDPA forbids habeas relief on issues "adjudicated on the merits" in state court unless the state decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

In practice, these standards generously defer to state adjudication.  The Supreme Court has held that a state court decision is only "contrary to" federal precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413 (2000); s*ee also Cone*, 535 U.S. at 698; *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  A state court may unreasonably apply federal law if it "identifies the correct

governing legal rule from [the Supreme Court] cases but unreasonably applies it to the particular facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

The AEDPA also affords significant deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2) "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A federal habeas court must presume the underlying factual determinations of the state court to be correct unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341.

Habeas law does not guarantee that a petitioner's compliance with 28 U.S.C. § 2254 entitles him to habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (noting that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). Other judicial doctrines, such as the harmless-error doctrine and the non-retroactivity principle, bridle federal

10

habeas relief.  *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005).  The

harmless-error doctrine allows relief predicated on trial errors only when they "ha[d]

a 'substantial and injurious effect or influence in determining the jury's verdict.'"

*Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629

(1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing

in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even

though any error of federal law that may have occurred did not affect the outcome.").

The non-retroactivity doctrine flowing from *Teague v. Lane*, 489 U.S. 288 (1989),

disallows relief if it would require the creation of new constitutional law.  *See Horn*,

536 U.S. at 272.

## Summary Judgment

Respondent has moved for summary judgment.  Summary judgment is proper

where the record shows "no genuine issues as to any material fact and that the moving

party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56.  In ordinary civil

cases, a district court considering a motion for summary judgment must construe

disputed facts in a light most favorable to the nonmoving party.  *See Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to

be believed, and all justifiable inferences are to be drawn in his favor").  "As a general

principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary

judgment, applies with equal force in the context of habeas corpus cases."  *Clark v.

*Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  However, a court must view a summary judgment motion through "the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.  Congress intended the AEDPA to constrict both the nature and availability of habeas review.  The Rules Governing Section 2254 Cases in the United States District Courts, along with traditional habeas practice, also allow for the summary dismissal of habeas claims.  This Court, therefore, applies general summary judgment standards only insofar as they do not conflict with the language and intent of the AEDPA or other habeas law.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) ("[Rule 56] applies only to the extent that it does not conflict with the habeas rules."), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); Rule 11 of the RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS ("The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules.").  Where the state courts have already resolved a prisoner's factual allegations by express or implicit findings, and the prisoner does not prove by clear and convincing evidence that 28 U.S.C. § 2254(e)(1)'s presumption of correctness should not apply, construing facts in his favor is inappropriate and unauthorized.

Maldonado presented many of his claims in state court.  The state courts issued detailed findings of fact and explicit conclusions of law with respect to each exhausted

claim.  Accordingly, the AEDPA largely guides this Court's summary judgment review.  As noted above, facts that the Texas state courts have decided adversely to Maldonado bind this Court unless he sufficiently refutes them.  Federal law plainly allows for summary dismissal of unexhausted claims even when no state fact findings guide federal review.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

## *Procedural Impediments to Federal Habeas Review*

As a precursor to federal review of his conviction and sentence, Maldonado must show that he presents his claims in a procedurally adequate manner.  Respondent argues that several claims are unexhausted or procedurally barred.[6]

The exhaustion and procedural default doctrines, both of which embody federal acquiescence to principles of comity and federalism, restrict consideration of habeas claims.  Federal courts have long required inmates to give state courts the first chance to rectify constitutional violations.  *See Ex parte Royall*, 117 U.S. 241, 251-52 (1886). To avoid the "'unseem[liness]' of a federal district court's overturning a state court

---

[6]  As the Court will discuss at length, the AEDPA imposes a strict one-year limitations period on the filing of federal habeas claims.  *See* 28 U.S.C. § 2244(d)(1).  Respondent argues that Maldonado's complex procedural history contains gaps in diligent litigation which, taken together, make his latest federal habeas petition untimely.  Also, Respondent argues that no equitable mechanism allows this Court to reach the merits of Maldonado's allegedly untimely claims.  The Court will discuss the timeliness of Maldonado's filings separately.

conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), the AEDPA requires an inmate to raise his federal habeas claims in the highest state court before habeas relief becomes available. *See* 28 U.S.C. 2254(b)(2); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999); *Burns v. Estelle*, 695 F.2d 847, 849 (5th Cir. 1983). Absent compliance with the exhaustion doctrine, the AEDPA only gives a federal court authority to deny a habeas claim. *See* 28 U.S.C. § 2254(b)(2). Respondent argues that Maldonado has not exhausted several claims.

The procedural default doctrine similarly constricts the scope of federal habeas review for claims that an inmate has not exhausted properly. As "[a] corollary to the habeas statute's exhaustion requirement, . . . federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley*, 541 U.S. 386, 392-93 (2004); *see also Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (stating that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). Under the procedural bar doctrine, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732. In such cases, consideration of a federal issue gives way to state procedural law.

*See Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman*, 501 U.S. at 731. Respondent argues that Maldonado presented several issues in a way that did not fully comply with state procedure.

A petitioner's failure to exhaust his claims may also result in a federal procedural bar. A federal procedural bar results when a petitioner raises an unexhausted claim and "'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (quoting *Coleman*, 501 U.S. at 735 n.1). In general, an inmate who files a petition containing unexhausted claims usually cannot return to state court because Texas' abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. PRO. art. 11.071 § 5) rigorously limits the filing of successive state habeas applications. The Fifth Circuit considers article 11.071 § 5 to be an adequate state procedural bar because the Texas courts strictly and regularly enforce its standards. *See Barrientes v. Johnson*, 221 F.3d 741, 759 (5th Cir. 2000); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998). Accordingly, the exhaustion and procedural bar doctrines prevent federal consideration of an inmate's claims.

Judicial accommodation prevents a state procedural default from becoming an insurmountable barrier to federal review. The Supreme Court has held that

[i]n all cases in which a state prisoner has defaulted his federal claims in

15

state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750.[7]   If the respondent shows that a state procedural bar precludes federal review, a petitioner shoulders the burden of overcoming the procedural hurdles.  *See McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991).

The Court will consider the procedural adequacy of each challenged claim before addressing its merits.

## THE AEDPA'S LIMITATIONS PERIOD

Before considering the merits of Maldonado's petition, the Court must determine whether he filed the instant action in a timely manner.  The AEDPA places strict limits on a petitioner's ability to file for habeas corpus relief.  Under 28 U.S.C. § 2244(d)(1)(A), an inmate generally has one year to file a federal habeas petition after his criminal judgment becomes final on direct appeal.  The Court of Criminal Appeals denied Maldonado's appeal on June 30, 1999, and denied rehearing on September 15, 1999.  Although Maldonado did not seek review in the United States Supreme Court, the time in which he could have filed a petition for certiorari tolls the

---

[7]   The fundamental miscarriage of justice exception exists "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'"  *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  Maldonado does not rely on the actual innocence exception to overcome the procedural bar.

limitations period.  *See* 28 U.S.C. § 2244(d)(1)(A); *Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) ("If a criminal defendant has pursued his direct appeal through the highest state court, then this period includes the 90 days for filing a petition for certiorari to the Supreme Court.").  Because the United States Supreme Court rules consider the time to file for certiorari review to begin after the disposition of a timely filed motion for rehearing, *Wilson v. Cain*, 564 F.3d 702, ___, 2009 WL 840246, at *3 (5th Cir. 2009), the AEDPA limitations period began running 90 days after the Court of Criminal Appeals denied rehearing.  *See Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003).

The AEDPA, however, allows a "properly filed application for State post-conviction or other collateral review" to toll the limitations period.  28 U.S.C. § 2244(d)(2).  Maldonado's initial state habeas action ran concurrent to his direct appeal.  Accordingly, Maldonado had one full year from when the Court of Criminal Appeals denied habeas relief on March 6, 2002, to file a federal petition.  *Ex parte Maldonado*, No. 51,612-01 (Mar. 6, 2002).

On June 20, 2002, the Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002), found a national consensus against the execution of mentally retarded defendants and held that the Eighth Amendment barred such punishment.  At that point, two potential deadlines existed for Maldonado's future federal litigation.  Maldonado needed to file a federal habeas petition by March 6, 2003, unless

17

additional state action tolled the AEDPA limitations period.  However, because the

AEDPA allows petitioners to seek federal review within a year from "the date on

which the constitutional right asserted was initially recognized by the Supreme

Court," 28 U.S.C. § 2244(d)(1)(C), Maldonado had until June 20, 2003, to advance

any *Atkins* claim in federal court.  *See Rivera v. Quarterman*, 505 F.3d 349, 352 (5th

Cir. 2007) ("June 20, 2003 . . . was the last day to bring an *Atkins* claim under

AEDPA's one-year statute of limitations period."); *In re Salazar*, 443 F.3d 430, 434

n.2 (5th Cir. 2006) ("The Supreme Court issued its decision in *Atkins* on June 20,

2002; therefore, the AEDPA limitations period expired on June 20, 2003[.]").

On March 6, 2003, Maldonado filed his initial federal habeas petition.

*Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 9).  Maldonado's first

petition was timely, even though he filed it on the last day of the limitations period

(when counting from the end of his first state habeas action).  In his first federal

petition, Maldonado conceded that he raised unexhausted claims, including an *Atkins*

claim.  Maldonado, however, argued that the Court should forgive the lack of

exhaustion of his claims for several reasons: he previously received inadequate legal

representation; his mental retardation made him unable to champion his own case

without competent counsel; and the newness of the *Atkins* decision made him

previously unable to present the claim in state court.  *Maldonado v. Cockrell*, No.

H:03-cv-811 (S.D. Tex.) (Doc. # 9 at 94-97).  In his initial petition, Maldonado asked

18

the Court to set in place the following procedure:

> If this Court chooses to dismiss this petition for failure to exhaust state remedies, protect the Petitioner's right to meaningful federal habeas review either by entering an order specifically holding this case in abeyance pending exhaustion pursuant to *Brewer v. Johnson*, 139 F.3d 491 (5th Cir. 1998) and/or entering an order specifically finding that the federal statute of limitations contained in the Antiterrorism and Effective Death Penalty Act will be equitably tolled for the entire duration of the time it takes Petitioner to prepare and file a petition for a writ of habeas corpus in state court.

*Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 9 at 98-99).

Respondent moved to dismiss the case without prejudice. *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 17). Respondent, however, would "not waive any argument regarding the application of the AEDPA's one year statute of limitations for the filing of a federal habeas petition." *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 17 at 5).

Maldonado filed an objection which expressed his fear that in any successive state habeas action Texas would provide insufficient habeas resources and give inadequate consideration to his mental retardation claim. Also, Maldonado worried about the effect a dismissal would have on the limitations period. Maldonado sought to ameliorate the effects of the limitations period by asking the Court to make two rulings. First, he asked "should this Court decide to dismiss Mr. Maldonado's Petition without prejudice, this Court clearly must provide equitable tolling for the entire petition from the date of the order to dismiss, while Maldonado proceeds in state

19

court, to the date of refiling in this Court." *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 22 at 19). Second, because he filed his first petition before a full year had elapsed from the *Atkins* decision, Maldonado asked that all his claims "be held to the same limitations period as his *Atkins* claim." *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 22 at 21). Maldonado requested an expedited ruling from the district court so that he could file his new state habeas application before one year had passed since the Supreme Court issued the *Atkins* decision. *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 23).

In response, Respondent filed a pleading stating that, after any dismissal without prejudice, the State would not "assert the AEDPA one-year statute of limitations as to his other unexhausted claims, provided that he raise his subsequent federal petition within the time allowed for his *Atkins* claims." *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 27 at 14). Respondent, however, cautioned: "The Director agrees only to waive the statute of limitations, provided that his federal petition is re-filed within the agreed upon time." *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 27 at 14 n.13).

On June 11, 2003, the Court dismissed the initial petition without prejudice.[8] The Court however, promised that "the statute of limitations for Maldonado to file a

---

[8] Since his initial action, the Supreme Court in *Rhines v. Weber*, 544 U.S. 269 (2005), has sanctioned a stay-and-abate procedure that maintains federal jurisdiction while allowing for state review.

20

federal habeas corpus petition following resolution of his *Atkins* claim in State court is tolled from March 6, 2003, through the date of this Order." *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 29). Under that Order, two time periods existed: (1) Maldonado was left without any time left on the one-year period from his initial state habeas action and (2) Maldonado had ten days left to raise an *Atkins* claim. Maldonado filed the instant federal habeas petition on September 14, 2007. (Doc. # 1). Maldonado's petition is only timely if he qualifies for either statutory or equitable tolling.

## I.    Statutory Tolling

Under 28 U.S.C. § 2244(d)(2) "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation[.]"  Maldonado filed his successive state habeas application on June 17, 2003.  The Texas Court of Criminal Appeals only let Maldonado proceed on his *Atkins* claim and remanded the case for an evidentiary hearing.  During the pendency of that action, Maldonado filed a third state habeas application.  On September 12, 2007, the Court of Criminal Appeals denied relief on his second habeas application and dismissed his third habeas action.  Maldonado filed the instant federal petition two days later, leaving one day remaining on the limitations period for his *Atkins* claim. While the Respondent does not specifically address the timeliness of Maldonado's

*Atkins* claim, it is clear that Maldonado filed that claim in a timely manner. Respondent argues that the AEDPA bars all the other claims in the instant federal petition because of gaps – amounting to only a few days – where Maldonado did not have any case pending.   Maldonado argues that proper application of the AEDPA makes his entire application timely.  Maldonado asserts that § 2244(d)(1)(C), which sets the clock running for some claims on "the date on which the constitutional right was initially recognized by the Supreme Court if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review," should apply to all the claims he raises in his federal habeas petition. Maldonado's arguments rest on the assumption that the AEDPA's limitation period applies to the filing of an entire petition, rather than on a claim-by-claim basis.  In other words, Maldonado argues that since his *Atkins* claim is timely, all his claims should be timely.[9]

The Supreme Court and the Fifth Circuit have not yet directly confronted the question of how to count the limitations period for a petition containing both new claims that would be timely under 28 U.S.C. § 2244(d)(1)(C), and also stale ones that would otherwise run afoul of § 2244(d)(1)(A).  In essence, the question is whether the

---

[9]   Maldonado's argument also rests on the assumption that the time that his first petition was pending in federal court will not count against his limitations period.  The tolling of his first petition is a matter of equitable, not statutory, tolling.  As this Court previously promised tolling during the time spent in federal court, the Court will presume that his reliance on that guarantee constitutes an adequate basis for equitable tolling.

limitations analysis requires a claim-by-claim review or whether one timely claim salvages the entire petition.  Circuit courts have come to differing conclusions as to whether § 2244(d) requires a claim-by-claim analysis.  *Compare Fielder v. Varner*, 379 F.3d 113, 117-21 (3d Cir. 2004) (analyzing the one-year limitations period on a claim-by-claim basis), *and Bachman v. Bagley*, 487 F.3d 979, 984 (6th Cir. 2007) (same), *with Walker v. Crosby*, 341 F.3d 1240, 1245 (11th Cir. 2003) (finding that the entire petition is timely as long as any claim is timely).  The Supreme Court has, however, hinted that a claim-by-claim analysis is appropriate.  As an aside in considering a related question, the Supreme Court described § 2244(d)(1)(C) as follows:

> Similarly, § 2244(d)(1) provides that a "1-year period of limitation shall apply to an *application* for a writ of habeas corpus." (Emphasis added.) The subsection then provides one means of calculating the limitation with regard to the "application" as a whole, § 2244(d)(1)(A) (date of final judgment), but three others that require claim-by-claim consideration, § 2244(d)(1)(B) (governmental interference); § 2244(d)(1)(C) (new right made retroactive); § 2244(d)(1)(D) (new factual predicate).

*Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005).  Under the interpretation suggested by *Pace*, only those claims expressly covered by 28 U.S.C. § 2244(b)(2) are available for consideration in a successive federal habeas petition.

The policies that drive federal habeas review support such a reading of the statute.  Congress wanted the limitations period to "speed up the habeas process

23

considerably," *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999), and "advance the finality of criminal convictions." *Mayle v. Felix*, 545 U.S. 644, 662 (2005).  While the delay in the instant case seems minimal, Maldonado's reading of the statute would allow a petitioner to link claims which he should have raised years before to a claim that is newly developed.  This Court does not find support in the AEDPA's statutory tolling provisions to permit the marriage of stale and fresh claims. *Cf. Felix*, 545 U.S. at 662 (barring claims raised in an amended petition filed after the expiration of the limitations period because, otherwise, "AEDPA's limitation period would have slim significance").  "An interpretation that resurrects otherwise dead claims merely because they are among the living . . . hardly seems consistent with the purposes that Congress intended § 2244(d)(1), and the AEDPA generally, to serve." *Ellis v. Quarterman*, 2008 WL 2963467, at *6 (S.D. Tex. 2008); *see also  Duncan v. Walker*, 533 U.S. 167, 179 (2001) (finding that the AEDPA "reduces the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review.").

Because a few days passed between the denial of state habeas relief and refiling in federal court, and Maldonado had no time left on the limitations period, the Court finds under a statutory tolling analysis that Maldonado filed only his *Atkins* claim in a timely manner.  From a statutory perspective, Maldonado cannot salvage his time-barred claims by including them in a petition with his *Atkins* claim.  This Court may

only consider their merits if equitable principles toll the limitations period.

## II.    Equitable Tolling

Federal courts "must be cautious not to apply the statute of limitations too harshly[.]" *United States v. Patterson*, 211 F.3d 927, 931 (5th Cir. 2000); *see also Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999). As a judicial accommodation in the interest of justice, federal courts have applied "[t]he doctrine of equitable tolling [to] preserve[] a plaintiff's claims when strict application of the statute of limitations would be inequitable." *Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998). The Supreme Court has "not decided whether § 2244(d) allows for equitable tolling," but to this point has assumed that equitable tolling will, in exceptional circumstances, allow federal review of time-barred claims. *Lawrence v. Florida*, 549 U.S. 327, 336 (2007).

"[T]he habeas petitioner bears the burden of establishing that equitable tolling is warranted." *Howland v. Quarterman*, 507 F.3d 840, 845 (5th Cir. 2007); *see also Phillips v. Donnelly*, 216 F.3d 508, 511 (5th Cir. 2000). "[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace*, 544 U.S. at 418; *see also Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999). To warrant equitable tolling, a petitioner must present more than a "garden variety claim of excusable neglect." *Irwin v. Department of Veterans Affairs*,

498 U.S. 89, 96 (1990); *Coleman*, 184 F.3d at 402.  "Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."  *Wallace v. Kato*, 549 U.S. 384, 396 (2007).

Some circumstances in the instant case discourage equitable forgiveness for the late filing.  Maldonado asserts that he has been diligent in pursuing relief, especially within the time constraints after the first federal dismissal.  When the Supreme Court issued the *Atkins* decision, Maldonado faced a choice: he could raise an *Atkins* claim in a successive state habeas application that would toll his limitations period or he could file a federal habeas petition that raised unquestionably unexhausted claims.[10] The limitations period would have been tolled had Maldonado filed his successive state application raising the *Atkins* claim before March 6, 2003, when he came to federal court.  However, Maldonado left himself no time on the AEDPA clock when he sought federal relief first.  Maldonado could have avoided the limitations period problems by litigating his *Atkins* claim in state court before invoking federal jurisdiction.

Nonetheless, the circumstances of this case merit equitable tolling.  This Court

---

[10]     Texas' habeas abstention doctrine would not let Maldonado raise his *Atkins* claim in state court while litigating a federal habeas petition that contained his other claims.  *See Ex parte Green*, 548 S.W.2d 914, 916 (Tex. Crim. App. 1977) ("A petitioner must decide which forum he will proceed in, because [the Texas Court of Criminal Appeals] will not, and a trial court in this State should not, consider a petitioner's application so long as the federal courts retain jurisdiction over the same matter.").

promised to leave Maldonado in the same place as he was before he filed his first petition; it made no other guarantee about equitable tolling.  The State of Texas, however, promised more.  Whether or not 28 U.S.C. § 2244(d)(1)(C) allows a petitioner to file timely and stale claims together, Respondent assured Maldonado that when he returned to federal court the limitations period for his *Atkins* claim would apply to all his claims.  (Doc. # 27 at 14).  Maldonado's actions strictly complied with a reliance on that guarantee.  Respondent now backs off the earlier agreement.  The Court will not condone this conduct.  Respondent's reneged promise is a unique circumstance sufficient to allow equitable tolling of the limitations period for Maldonado's claims.

The Court, therefore, holds that the AEDPA's limitations period does not foreclose federal review of the claims in Maldonado's petition.  The Court now turns to the claims Maldonado raises on federal review.

## DISCUSSION OF MALDONADO'S HABEAS CLAIMS

### I.   Mental Retardation

Maldonado claims that mental retardation precludes his execution.  The state habeas court liberally allowed for the presentation of Maldonado's *Atkins* claim.  The state habeas court considered extensive argument, comprehensive pleadings, and voluminous exhibits on this issue, culminating in a lengthy evidentiary hearing in

which each party called both lay and expert witnesses who gave detailed testimony.[11]

After providing a fair opportunity to develop legal and factual issues, the state habeas court entered explicit findings and conclusions denying Maldonado's *Atkins* claim. In essence, the state court found that Maldonado "failed to show by a preponderance of evidence that he meets the three-prong definition of mental retardation and fails by a preponderance of the evidence to prove mental retardation." S.H. at 2524.

Maldonado argues that the state habeas court wrongly found him eligible for execution. Additionally, Maldonado faults the state process which addressed his *Atkins* claim, arguing that the Constitution only authorizes a jury to decide whether an inmate falls within *Atkins*' exemption from execution. Against the backdrop of the comprehensive state court proceedings, this Court must decide whether Maldonado has shown that his sentence should be reformed to life imprisonment.

## A.    Background

The Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002), found a national consensus against the execution of mentally retarded defendants. Under the Eighth Amendment's "evolving standards of decency" review, the *Atkins* Court stated that "death is not a suitable punishment for a mentally retarded criminal." *Id.* at 321. The *Atkins* Court, however, approached the birth of this new constitutional rule with

---

[11]    The state habeas court afforded Maldonado a full and fair forum for the development of his *Atkins* claim. Maldonado does not propose any testimony or evidence relating to his *Atkins* claim that needs development through a federal evidentiary hearing.

caution.  While acknowledging that prevalent societal norms protect the mentally retarded, the Supreme Court declined to decide categorically which murderers would be exempt from execution.  In fact, the Court foresaw that the most serious difficulty in implementing its ruling would be "determining which offenders are in fact retarded."  *Id.* at 317.  Instead of creating a bright-line test to determine ineligibility for death, the Supreme Court left "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)); *see also Bobby v. Bies*, ___ U.S. ___, 129 S. Ct. 2145, 2150 (2009) ("Our opinion [in *Atkins*] did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation 'will be so impaired as to fall [within *Atkins*' compass].'") (quoting *Atkins*, 536 U.S. at 317); *Moore v. Quarterman*, 454 F.3d 484, 493 (5th Cir. 2006) ("[T]he *Atkins* Court did not adopt a particular criteria for determining whether a defendant is mentally retarded[.]").

The Texas State Legislature has not enacted any statute that gives effect to the *Atkins* decision, leaving its interpretation to the courts.  As a stop-gasp measure, the Texas Court of Criminal Appeals has developed standards by which it evaluates a capital inmate's claim of retardation.  In *Ex parte Briseno*, 135 S.W.3d 1, 5 (Tex. Crim. App. 2004), the Court of Criminal Appeals decided that "[u]ntil the Texas legislature provides an alternative definition of 'mental retardation' for use in capital

sentencing," Texas courts will adjudicate *Atkins* claims under the framework established by the American Association on Mental Retardation ("AAMR"),[12] in conjunction with those standards contained in Texas' Persons with Mental Retardation Act ("PMRA"), TEX. HEATH & SAFETY CODE § 591.003(13).  *Briseno*, 135 S.W.3d at 8.   Specifically, *Briseno* acknowledged the AAMR's definition of mental retardation, as quoted in *Atkins*:

> "Mental retardation refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."

*Atkins*, 536 U.S. at 309 n.3 (quoting American Association of Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)).[13]  The PMRA, which differs only slightly from the AAMR statement,

---

[12]    The American Association on Mental Retardation (now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD")) currently uses the term "intellectual disability" instead of mental retardation.  *See* Definition of Intellectual Disability, http://www.aamr.org/content_100.cfm?navID=21.  This is only the most-recent terminology in the psychological community's evolving understanding of mental retardation.  *See* AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT 20-23 (10th Ed. 2002) ("AAMR 10th") (outlining the various definitions of and terms for mental retardation used by the mental health community in the last century).  Because the legal community has not yet adopted the new terminology, the Court will refer to the AAMR and mental retardation by their traditional terms.

[13]    The *Atkins* Court relied on the AAMR 9th edition's understanding of mental retardation.  In May 2002, the AAMR released a 10th edition that slightly modified its definition of mental retardation: "Mental retardation is a disability characterized by significant limitations both (continued...)

defines mental retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEATH & SAFETY CODE § 591.003(13).

Taken together, the AAMR and the PMRA definitions contain three indispensable components for a finding of mental retardation: (1) substantial limitations in intellectual functioning; (2) significant limitations in adaptive skill areas; and (3) manifestation of those limitations before age 18. A petitioner must meet all three elements to show that his execution would violate the Constitution. *See Clark v. Quarterman*, 457 F.3d 441, 446 (5th Cir. 2006). "Determination of whether [a petitioner] satisfies any of these elements is a question of fact." *Eldridge v. Quarterman*, 325 F.App'x 322, 325 (5th Cir. 2009). Here, the state habeas court referenced the appropriate standards in adjudicating Maldonado's *Atkins* claim. S.H. at 2495.

Since *Atkins*, courts have struggled to guarantee that convicted capital murderers who claim to be mentally retarded are evaluated in a nonarbitrary manner.

---

13      (...continued)
        in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAMR 10TH at1 (10th Ed. 2002). In addition to the AAMR, the *Atkins* Court also referenced the American Psychiatric Association's ("APA") definition of mental retardation. *See Atkins*, 536 U.S. at 309 n.3 (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000)). The *Briseno* opinion did not rely on the APA standards. The APA and the 10th Edition AAMR standards for mental retardation, however, contain substantially the same criteria for determining mental retardation as in *Atkins See Atkins*, 536 U.S. at 309 n.3 (noting the similarity between the professional standards).

Because the Supreme Court did not establish a bright-line test to identify mental retardation, the *Atkins* inquiry has become a fact-intensive question that heavily relies on the opinions provided by mental-health experts.  This case, like most involving *Atkins* claims, requires consideration of testimony from competing experts who disagree about the nature of mental retardation, the means by which it may be identified, the manner in which it manifests in a criminal defendant's life, and the psychological profession's role in making the legal decision of whether mental capacity precludes execution.

Here, experts retained by both parties based their opinions on the same professional standards, but applied them in ways that resulted in widely different results.  Maldonado retained two experts – Dr. Ricardo Weinstein and Dr. Antonio Puente – to perform neuropsychological testing.  Both doctors concluded that Maldonado is mentally retarded.  The State retained Dr. George Denkowski, a clinical psychologist, to test Maldonado for mental retardation.  He came to the conclusion that Maldonado, while having low intelligence, does not meet the requirements for a diagnosis of mental retardation.  In the evidentiary hearing, other mental health experts testified after reviewing the three prior examinations and commented on the administration and results of those tests.  Given the highly divergent opinions by psychological experts when evaluating the same individual, this case confirms that "[p]sychiatry is not . . . an exact science, and psychiatrists disagree widely and

frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior, [and] on cure and treatment[.]" *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985); *see also Jones v. United States*, 463 U.S. 354, 365 (1983) ("We have recognized repeatedly the uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment.").

Against the backdrop of dueling expert opinions, it must be remembered that the habeas writ exists only for constitutional violations. *See* 28 U.S.C. §2254(a). Federal habeas review does not make certain that a state court ruling complies perfectly with the standards created by professional organizations – though psychological standards certainly inform the *Atkins* inquiry. As recognized by the Court of Criminal Appeals opinion in *Briseno*:

> Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility.

*Briseno*, 135 S.W.3d at 9. A constitutional understanding of "mental retardation" may not be the same as the usage given that term by the psychological profession. *Cf. Kansas v. Crane*, 534 U.S. 407, 413 (2002) ("[T]he science of psychiatry, which

33

informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law.").[14]  In fact, nothing in *Atkins* jurisprudence requires the constitutional protections for the mentally retarded to be interchangeable with psychological standards.

Thus, this Court's role on habeas review is not necessarily to evaluate whether psychologists have properly considered and invariably applied the standards that govern their profession.  The Court's limited, and well-defined, duty is to determine whether an inmate's conviction and sentence comport with constitutional standards. This Court's review, therefore, centers on whether the state courts reasonably applied

---

[14]     As an example of the difficulty in founding bedrock legal concepts on malleable psychological principles, the AAMR has changed the term for and defining characteristics of mental retardation since the Supreme Court issued the *Atkins* decision.  The AAMR itself recognizes that

> [t]he field of mental retardation is currently in a state of flux regarding not just a fuller understanding of the condition of mental retardation, but also the language and process used in naming, defining, and classifying.  For example, we are in the midst of discussions about the nature of intelligence; the relationship between intelligence and adaptive behavior; the implementation of the supports paradigm; the best way to conceptualize disabling conditions; the impact of consumer and reform movements; and the effects of terminology on individual lives.

> This state of flux is both frustrating and challenging.  It is frustrating because it prohibits one from relying on past language, definitions, and models of mental retardation that can be a source of stability and permanence to some. However, the state is also challenging, as it provides the opportunity to incorporate the current and evolving understanding of the condition of mental retardation and the factors that influence the lives of people in their societies.

AAMR 10TH at xii.

34

the substance of the *Atkins* decision, with guidance from how the psychological profession (and psychologists themselves) diagnose mental retardation.

### B.    Who Should Decide If Maldonado Is Mentally Retarded?

Before turning to the substance of Maldonado's *Atkins* claim, the Court pauses briefly to address Maldonado's argument that Texas violated his constitutional rights by not requiring a jury to decide whether he is mentally retarded.[15]  Maldonado relies on Supreme Court cases which have repeatedly emphasized that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *see also Ring v. Arizona*, 536 U.S. 584, 609 (2002) (extending *Apprendi* to Arizona's capital sentencing scheme).  Maldonado argues that, because *Atkins* placed a substantive limitation on the State's ability to carry out a death sentence, the Supreme Court essentially made freedom from mental retardation an essential element of all capital crimes.  Maldonado assumes that *Atkins* thus placed mental retardation within the purview of *Apprendi* jurisprudence, requiring a jury to decide whether his mental

---

[15]    Respondent argues that this claim is unexhausted.  While not listing it as a ground for relief, Maldonado filed motions in state habeas court asking for a jury to decide if he was mentally retarded.  S.H. at 932-45, 948-56, 2090-2105.  The state habeas court denied his requests for a jury determination.  S.H. at 2107.  Whether or not that suffices to exhaust his federal claim, the AEDPA allows federal courts to deny unexhausted claims on their merits.  *See* 28 U.S.C. § 2254(b)(2).  As the law on this issue is clear, the Court will briefly address the merits of Maldonado's attempt to place *Atkins* claims within the purview of *Apprendi* jurisprudence.

retardation excludes the death penalty as a sentencing option.  Maldonado complains that a jury, not a judge, should have decided if he is mentally retarded.

A "welter of uncertainty" followed the *Atkins* decision because "[t]he Supreme Court neither conclusively defined mental retardation nor provided guidance on how its ruling should be applied to prisoners already convicted of capital murder."  *Bell v. Cockrell*, 310 F.3d 330, 332 (5th Cir. 2002).  Accordingly, federal courts have approached the implementation of *Atkins* with some trepidation.  Because *Atkins* left the States to define the class of offenders ineligible for execution, *see Atkins*, 536 U.S. at 317, the Fifth Circuit has previously cautioned that "it would be wholly inappropriate for [a federal court], by judicial fiat, to tell the States how to conduct an inquiry into a defendant's mental retardation."  *In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003); *see also Schriro v. Smith*, 546 U.S. 6, 8 (2005) (refusing to adjudicate preemptively which approach would comply with *Atkins* and remanding the case so that the State would "ha[ve] a chance to apply its chosen procedures").  Even so, the Fifth Circuit has conclusively decided that the Constitution does not require that a jury make the *Atkins* determination.  *See Johnson*, 334 F.3d at 405; *see also In re Woods*, 155 F.App'x 132, 135-36 (5th Cir. 2005) ("[T]he factfinder with respect to a determination of mental retardation need not be a jury[.]"); *United States v. Webster*, 421 F.3d 308, 311-12 (5th Cir. 2005) (refusing to certify an appeal from a 28 U.S.C. § 2255 action based on *Apprendi*'s application to *Atkins* claims); *see also Walker v.*

36

*True*, 399 F.3d 315, 325-26 (4th Cir. 2005) (finding no constitutional requirement that a jury determine mental retardation).[16]

Unquestionably, the federal constitution assumes that some vehicle will give effect to the *Atkins* ruling. Yet Maldonado has not shown that Supreme Court precedent requires a jury to determine if a capital inmate is mentally retarded. This Court, therefore, will turn to the question of whether the state habeas court reasonably found that Maldonado did not meet his burden for habeas relief.

## C.   Is Maldonado Mentally Retarded?

The *Atkins* issue comes before the Court with a well-developed record. The ample testimony and evidence provides a complex picture of Maldonado's mental abilities. In state court, the parties differed sharply on the ultimate question of

---

[16]   *Atkins* does not "render the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt." *See Johnson*, 334 F.3d at 405. This result, in part, flows from the basic tenets of *Apprendi* jurisprudence. *Apprendi* and its progeny provide that

> [i]f a State makes *an increase in a defendant's authorized punishment* contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt. A defendant may not be exposed to a penalty *exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone*.

*Ring*, 536 U.S. at 602 (emphasis added, quotations and citations omitted). Once a Texas jury convicts a capital defendant, it has found the existence of an aggravating circumstance that makes the offender eligible for a death sentence. Then, "the finding of mental retardation does not increase the penalty for the crime beyond the statutory maximum – death." *Walker*, 399 F.3d at 326. The *Atkins* inquiry operates instead as a defense which, like an insanity claim, can only decrease a prisoner's potential sentence. *Id.* ("[T]he absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense.").

whether he is mentally retarded.  Nevertheless, their arguments found some consensus in the fact that Maldonado is not intelligent and is functionally uneducated.  A theme developed by both parties is that Maldonado's lack of English proficiency has made his exact intellectual capacity difficult to gauge.  Against that backdrop, the Court must review the evidence presented in state court and place it in the context of *Atkins*' tripartite mental retardation inquiry.

### 1. Substantial Limitations in Intellectual Functioning

To qualify for a diagnosis of mental retardation, an individual must first prove substantial limitations in intellectual functioning.  The Texas Court of Criminal Appeals in *Briseno* recognized IQ as a distinguishing indicator of intellectual functioning: "Significantly subaverage general intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)." *Briseno*, 135 S.W.3d at 7 n. 24.[17]  Nevertheless, "[n]othing in the *Briseno* standard

---

[17]    The APA recognizes four categories of mental retardation: mild, moderate, severe, and profound. *see Briseno*, 135 S.W.3d at 5 (citing APA, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41-42 (Text Revision, 4th ed. 2000) (hereinafter "DSM-IV-TR")).  A standardized IQ test's mean score is typically 100, with a standard deviation of 15; thus, a score of about 70 is approximately two standard deviations from the mean. *See Briseno*, 135 S.W.3d at 5.  IQ tests typically have a five point standard error of measurement, which means that any score actually represents an IQ that could be five points higher or lower. Accordingly, a test score of 70 may symbolize an IQ as high as 75 or as low as 65. *See id.* at 14 n. 53; DSM-IV at 39.  Individuals with IQ scores between 55 and 70 – around 85% of the mentally retarded population – are classified as mildly mentally retarded if they satisfy the adaptive-functioning and age-at-onset criteria. *See* DSM-IV at 40-41; *see also* AAMR 10TH at 31 (remarking that between 75% to 89% of the population with mental retardation is mildly mentally retarded).

compels a blind adherence to IQ.  In fact, *Briseno* itself recognizes that IQ alone is not determinative of mental retardation."  *Williams v. Quarterman*, 293 F.App'x 298, 311 (5th Cir. 2008).  The Fifth Circuit likewise "counsels a flexible approach to reading IQ scores, warning that 'courts should not rigidly consider an IQ score to be determinative of the defendant's intellectual functioning.'"  *Williams*, 293 F.App'x at 309 (quoting *Clark*, 457 F.3d at 444-45).

*Atkins* itself did not establish a numerical IQ threshold for death-eligibility.  In *Briseno*, the Court of Criminal Appeals recognized some variation in the ceiling for mental retardation because mental-health experts view intelligence as existing along a range.  While recognizing that professional organizations diagnose retardation in individuals possessing an IQ of "approximately 70" or "between 70 and 75," the *Atkins* Court expressly refused to usurp the States' right to determine which inmates are "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus" against their execution.  *Atkins*, 536 U.S. at 309, 317 (emphasis added).  Accordingly, the Texas Court of Criminal Appeals has questioned where to place the upper threshold of the *Atkins* protection:

> Most Texas citizens might agree that Steinbeck's Lennie should, by virtue of his lack of reasoning ability and adaptive skills, be exempt [from execution]. But, does a consensus of Texas citizens agree that all persons who might legitimately qualify for assistance under the social services definition of mental retardation be exempt from an otherwise constitutional penalty?  Put another way, is there a national or Texas consensus that all of those persons whom the mental health profession

39

> might diagnose as meeting the criteria for mental retardation are automatically less morally culpable than those who just barely miss meeting those criteria?   Is there, and should there be, a "mental retardation" bright-line exemption from our state's maximum statutory punishment?

*Briseno*, 135 S.W.3d at 6 (footnote omitted).   Ultimately, the Court of Criminal Appeals has refused to "answer that normative question without significantly greater assistance from the [Texas] citizenry acting through its Legislature."   *Id.*

While Texas has not established 70 as a bright-line standard, it has not expressly adopted another score as the retardation threshold either.   Other states have provided varying responses to *Atkins*: some have not yet enacted legislation that codifies the *Atkins* decision, some explicitly adopted the standards established by professional organizations, some view an IQ of 70 as a cutoff, and others accommodate professional standards through legal analysis.   *See Garcia Briseno v. Dretke*, 2007 WL 998743, at *10 (S.D. Tex. 2007) (reviewing the various States' application of *Atkins*).   Here, the state courts apparently assumed that an IQ of 70 would meet the intellectual limitations component.   The state court gave no clear statement on whether measurement error can create a range in scores where an IQ above 70 qualifies for a diagnosis of mental retardation.[18]

The state habeas hearing amounted to a battle of experts with respect to

---

[18]   The state habeas court stated, without elaboration, that "two or more standard deviations below the age-group mean consists of an IQ score of 70 or less."   S.H. at 2498.

Maldonado's level of intelligence.   The experts in this case used Maldonado's performance on psychological testing to form their opinion of whether he possesses significant limitations in intellectual functioning.  The experts tested Maldonado with various psychometric instruments, reaching various conclusions.   The parties, however, primarily relied on the results of five tests to detect Maldonado's level of cognitive functioning.  Those tests yielded the following scores:

> The Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III") - 72
>
> The Escala Inteligencia Wechsler para Adultos ("WAIS-Español" or "EIWA") - 83 (on one completed portion)
>
> The Comprehensive Test of Nonverbal Intelligence ("CTONI") - 61
>
> The Beta-III - 70
>
> The Woodcock-Muñoz Bateria-R ("Bateria-R") - 61

To place the state court proceedings into context, the Court will briefly summarize the testing.  The Court will later review the experts' testing and interpretation at greater length.

Three experts examined Maldonado before the evidentiary hearing.   On February 5 and 6, 2003, Dr. Ricardo Weinstein administered several testing instruments, including the Bateria-R.  Dr. Weinstein, a native Spanish speaker, tested Maldonado in Spanish.  On March 1, 2003, Dr. Weinstein signed a "declaration" in which he stated that the Bateria-R testing showed that Maldonado's deficits in

intelligence were pronounced and pervasive.  His opinion placed Maldonado in a category where his mental retardation should be obvious because his "cognitive functioning . . . is equivalent to that of a child at age seven years ten months[.] . . . His score is below the 1st percentile rank, and more than two standard deviations below the mean."  S.H. at 82.  Dr. Weinstein did not report that he also administered a portion of the WAIS-Español which resulted in a raw score that placed Maldonado well above the range for mental retardation.

Dr. Denkowski examined Maldonado on May 23 and 24, 2005.  Among other testing instruments, he administered the WAIS-III though a translator.  In his report,[19] Dr. Denkowski opined that "Maldonado's adult intelligence is of 74 to 83 full scale IQ quality, which shows that adult general intellectual functioning is not significantly subaverage."  S.H. at 1985.  Even when considering that measurement error may allow for Maldonado's IQ score to dip below 70, Dr. Denkowski opined that "cultural differences" and "anxiety and depression" would mean that the testing probably artificially lowered his IQ score.  S.H. at 2011.  Dr. Denkowski also heavily criticized Dr. Weinstein's opinion, finding that the testing on the whole showed that "Maldonado's neuropsychological functioning is adequate."  S.H. at 1995.

Dr. Antonio Puente tested Maldonado on June 27 and 28, 2006.  He reviewed

---

[19]      The notarized date of his report reads June 7, 2004.  S.H. at 2014.

Dr. Weinstein and Dr. Denkowski's earlier testing, including the videotaped examination by Dr. Denkowski.  Dr. Puente administered many neuropsychological tests, including the CTONI and Beta-III, in Spanish.  In his report dated August 30, 2006, Dr. Puente opined that his testing showed that Maldonado had significantly subaverage intelligence.  Yet Dr. Puente did not consider Maldonado to be as intellectually deficient as Dr. Weinstein did.  Dr. Puente's report opined: "Academic abilities range equivalent to approximately 10 years of age or 4.5 years of education. Intellectual functions are in the mild mental retardation range."  Dr. Puente considered Dr. Denkowski's testing to be invalid because "the evaluation deviates from standard psychological practice and the conclusions appear to be based on ethnic and cultural profiling."  S.H. at 2162.

The state habeas court held an evidentiary hearing on September 11, 13, 14, and 15 and November 16, 17, and 27, 2006.  There, experts testified about the validity of their own testing; the weaknesses in other testing instruments, test procedures, and test results; and the significance of the test results in comparison to elements of Maldonado's life.  The experts who testified in the evidentiary hearing – Dr. George Denkowski who testified for the State and Dr. Jack M. Fletcher and Dr. Antonio Puente who testified for Maldonado – commented on the validity and interpretation

of each side's choice of testing instruments.[20]  The state habeas court also reviewed

psychological reports prepared by experts and supplemental affidavits developing and

rebutting the evolving evidentiary picture.

The state habeas court based its ultimate findings on two primary theories.

First, Maldonado's scores from the WAIS-III and the WAIS-Español most accurately

reflected his IQ level.  Second, even assuming that the WAIS-III and WAIS-Español

scores were invalid or inaccurate, the scores from the Bateria-R, the Beta-III and the

CTONI did not establish significantly subaverage intellectual functioning.  Reduced

to their essence, the two theories were that Respondent had shown that Maldonado

*was not* mentally retarded and Maldonado *had not shown that he was* mentally

retarded.  While Maldonado always bears the burden on his *Atkins* claim, the Court

will address those two theories in that order.  The Court will review the evidentiary

hearing testimony and evidence concerning the results from, and the relevant validity

of, each test that the experts administered to Maldonado.

---

[20]     Other witnesses testified in the evidentiary hearing.  For instance, Maldonado began the evidentiary hearing by calling Dr. Tara Waas, a psychologist, to discuss how Maldonado's mother drank heavily during pregnancy, possibly causing him to suffer from Fetal Alcohol Syndrome.  Though she did not have the professional qualifications to diagnose either condition, Dr. Wass testified that mental retardation "is one common outcome" of Fetal Alcohol Syndrome.  S.H.R. Vol. 2 at 21.  However, Dr. Denkowski emphasized that Fetal Alcohol Syndrome is not always accompanied by mental retardation.  S.H.R. Vol. 3 at 70.  Maternal alcohol consumption during pregnancy is a predisposing factor in 10% of individuals with mental retardation.  *See* DSM-IV-TR at 43.  Also, many lay witnesses testified about Maldonado's life history and mental abilities.  Only Dr. Puente, Dr. Fletcher, and Dr. Denkowski discussed Maldoando's IQ scores in the evidentiary hearing.

### *The WAIS-III*

To the first theory, the most hotly disputed test results in this case came from the examination performed by the State's expert, Dr. Denkowski.  Dr. Denkowski has been active in evaluating death-row inmates for mental retardation after the *Atkins* decision.  When Dr. Denkowski examined Maldonado, had previously evaluated 26 capital inmates, both as an expert for the State and for inmates, finding nine death-row inmates to be retarded.[21]  Here, Dr. Denkowski performed two days of examination, engaging Maldonado in five hours of clinical interviewing and four hours of intellectual testing.  Before administering any psychometric instruments that measured intelligence, Dr. Denkowski tested Maldonado's level of anxiety and depression, finding him to be mild to moderately anxious and moderately depressed.  Dr. Denkowski then performed several tests.[22]  Dr. Denkowski videotaped the testing and interview.

Most germane to the issues before the Court, Dr. Denkowski administered the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III").  The WAIS-III is "the

---

[21]   By the time of the state habeas hearing, Dr. Denkowski had been involved in *Atkins* determinations with six additional death row inmates, three of whom he found to be mentally retarded.  S.H.R. Vol. 3 at 60.  He served as an expert for the inmate in three of those cases.  S.H.R. Vol. 3 at 163.

[22]   Dr. Denkowski also performed the following tests that did not measure IQ: Beck Depression Inventory – Second Edition; Beck Anxiety Inventory – Spanish Translation; Test of Memory Malingering; Dot Counting Test; Wide Range Achievement Test - Third Edition; and Adaptive Behavior Assessment System.  Dr. Puente found irregularities in Dr. Denkowski's administration of some of those tests.  S.H. at 2149.

standard instrument in the United States for assessing intellectual functioning." *Atkins*, 536 U.S. at 309 n.5. The WAIS-III, however, is not the only test. The *Briseno* court noted the existence of other IQ tests, though they "differ in content and accuracy." *Briseno*, 135 S.W.3d at 7 n.24. The experts in this case generally agreed that, when conditions favor its use, the WAIS-III is the "gold standard" for mental retardation testing. S.H.R. Vol. 2 at 130.

Dr. Denkowski's WAIS-III administration was under less-than-optimal conditions, largely because Maldonado does not speak English well. Dr. Denkowski's state habeas affidavit described the circumstances of the testing:

> Mr. Maldonado was examined at the Harris County Jail. Since it appeared that [Maldonado] was bilingual, an effort was made to conduct the examination in English. When Mr. [Maldonado] informed that he could not interact in English, Mr. Glen Dodson, a State licenced Spanish-English interpreter, was summoned from stand-by. The request to have a translator on stand-by was made by me so that the examination would not be delayed if Mr. Maldonado's English proved to be inadequate. Until Mr. Maldonado became stressed on the second day of examination, the procedure was to direct questions to him in English, have them translated into Spanish, and then have his answers translated into English.

S.H. at 1983.[23] Dr. Denkowski opined "this procedure did not disadvantage Mr.

---

[23] Some confusion exists about how Dr. Denkowski came to use a translator in the examination. By his account, Dr. Denkowski "thought [Maldonado] spoke enough English to get through the evaluation but [he] wasn't sure, which is why [he] had asked for a translator to be on standby in case [he] was wrong." S.H.R. Vol. 3 at 75. Dr. Denkowski requested assistance when, as he began the examination, he discovered that Maldonado could not communicate competently in English. Maldonado observes, however, that he filed
(continued...)

Maldonado." S.H. at 1983. Dr. Denkowski testified that using a translator for mental retardation testing "is commonly done." S.H.R. Vol. 3 at 80.

Dr. Denkowski concluded that Maldonado's "general intellectual functioning was not significantly subaverage during his developmental period" because "Mr. Maldonado's adult intelligence is of 74 to 83 full scale IQ quality, which shows that adult general intellectual functioning is not significantly subaverage." S.H. at 1985. Dr. Denkowski's WAIS-III testing resulted in a raw score of 74 on the verbal portion, a 74 on the performance portion, and a full scale IQ of 72. If considering the downward range provided by measurement error, Dr. Denkowski's results could facially qualify for a diagnosis of mental retardation.

Dr. Denkowski, however, discounted his scoring as a predicate for a diagnosis

---

23      (...continued)

a motion on May 11, 2005 – before Dr. Denkowski began his examination – which discussed the language problem that would arise. In his motion entitled "Objections to Respondent's Expert and Motion to Prevent Expert from Examining Applicant and, in the Alternative, Set Conditions for Examination, Maldonado argued that, while Dr. Denkowski was a licenced psychologist and certified to perform mental retardation examinations, he was "*not a native Spanish speaker, nor is he fluent in Spanish, nor is he knowledgeable about the society and culture of rural Mexico*." S.H. at 965. According to Maldonado, this lack of relevant experience limited Dr. Denkowski's ability to evaluate him properly. If the state habeas court would not exclude Dr. Denkowski as an expert, Maldonado asked that his examination be videotaped. Maldonado attached to his motion a pleading from trial record affirming that he needed a translator. S.H. at 975. The trial court granted the request for videotaping but orally denied the motion to exclude and suggested that its ultimate findings would address any issues with the reliability or relevance of Dr. Denkowski's testimony. S.H. at 1080; S.H.R. Vol. 3 at 57-58. In a separate order, however, the state habeas court ordered that translator Glen Dodson be permitted to accompany Dr. Denkowski during the testing. Also, the state habeas court ordered that "should any problems arise in conducting or translating said examination" that "the same be reported to this Honorable Court immediately." S.H. at 1083.

of mental retardation under the WAIS-III testing standards mainly because of his opinion that other factors may have suppressed Maldonado's IQ scores. S.H.R. Vol. 3 at 96. Dr. Denkowski testified that the WAIS-III manual "says . . . you have to rule out [cultural or educational] factors. This means before you can accept the IQ at face value, you have to be sure that those factors did not suppress the IQ." S.H.R. Vol. 3 at 123. Dr. Denkowski testified that Maldonado's scores could be artificially low because he is a poor test taker. S.H.R. Vol. 3 at 124.[24] Most importantly, Dr. Denkowski testified that cultural and educational factors skewed Maldonado's IQ score. According to Dr. Denkowski, Maldonado's true IQ score is:

> somewhere between the 74 to 83. It's really hard to say. You can't use the confidence method here because you're estimating, but it should be somewhere in the range where the psych scores match, which is the lower 80s, and in the range where the WAIS Espanol; verbal IQ of 83 lies; maybe a little lower, but it's somewhere in that range. It's around the 80s, I guess, if you had to pin me down. Around the 80s; somewhere in there.

---

[24] At the same time, Dr. Denkowski stated that

> Maldonado's scores on the *Test of Memory Malingering* and on the *Dot Counting Test* indicated that he exerted good effort during *WAIS-III* testing. His score on the Spanish translation of the Beck Anxiety Inventory ranged between 16 to 20, which conveys a mild to moderate level of anxiety . . . [which] is known to impede performance on mental ability tasks that make notable demands on attention/concentration . . . It is therefore unlikely Mr. Maldonado was able to perform optimally on *WAIS-III* subtests that impose notable concentration demands[.]

S.H. at 2009.

S.H.R. Vol. 3 at 125.   Based on those scores, Dr. Denkowski testified that Maldonado's IQ would be in the "borderline normal range."  S.H.R. Vol. 3 at 125.

Maldonado's experts have subjected Dr. Denkowski's testing to two main criticisms: (1) his use of a translator either invalidated or weakened the integrity of his test results and (2) his interpretation of the results has no basis in proper psychological principles.[25]  The Court will examine the basis for these two objections.

*Use of a Translator* - Before the state evidentiary hearing was held, Maldonado filed motions to prevent Dr. Denkowski from examining Maldonado because he would need to use a translator.  Dr. Puente's affidavit in state habeas court stated: "The accepted practice in the evaluation on Spanish-speakers is to communicate with the client in Spanish without the use of translators.  In addition, tests should be scientifically translated and validated and the most appropriate norms available should be applied."  S.H. at 2147.  Dr. Puente reviewed the videotaped testing by Dr. Denkowski and found it inadequate:

> [T]he evaluation was completed in English with a non-trained translator, whose qualifications are not available, translating the literal, though not cognitively equivalent, version of the question.  On a regular basis, the translations were not understood by the client and the translator revised the translation back without a back-translation or consent from the evaluator.  At times the eventual question did not represent the original one.  Also, there was limited rapport between the evaluator and the client

---

[25]  Dr. Puente's report noted two differences between Dr. Denkowski's report and that of the other experts: "the evaluation deviates from standard psychological practice and the conclusions appear to be based on ethnic and cultural profiling."  S.H. at 2162.

causing a misunderstanding of and a significant amount of delay in responding to questions, unduly prolonging the length of the evaluation.

S.H. at 2149.[26]   According to Dr. Puente's report, "[t]he Denkowski report is considered invalid due to the use of a translator and the atypical translation and application of tests and their norms." S.H. at 2162. Dr. Puente, however, was more guarded at the evidentiary hearing: "I wouldn't say I'm unhappy [with the way in which Dr. Denkowski used a translator] but it didn't seem to match my own approach to such evaluations." S.H.R. Vol. 2 at 139. Dr. Puente affirmed: "having a translator who doesn't know psychology, translating on the fly, is a far cry from the gold standard." S.H.R. Vol. 3 at 104.

In the evidentiary hearing, Maldonado tried to show that Dr. Denkowski's use of a translator invalidated his scores. According to the testimony in state habeas court, one testing manual states: "A clinician should not utilize an interpreter to merely translate and present items to the examinee. Aside from issues of validity and reliability, such a procedure is in violation of standard test administration and calls into question the utility and meaning of the scores and their interpretation." S.H.R. Vol. 2 at 156. Dr. Jack McFarlin Fletcher, a clinical neuropsychological professor with the University of Houston, testified that it would be "inappropriate" to

---

[26] Dr. Weinstein also submitted an affidavit after reviewing Dr. Denkowski's report and made similar criticisms of the use of a translator. Dr. Weinstein provided a supplemental affidavit that objected to testing where the translator is unfamiliar with testing procedures and the expert has insufficient knowledge of the subject's cultural background. S.H. at 2256.

"administer[] the intelligence test through an interpreter who is not trained or otherwise prepared to administer these types of tests."  S.H.R. Vol. 16 at 13.[27]  Dr. Fletcher testified that the use of a translator completely invalidated Dr. Denkowski's score.  S.H.R. Vol. 3 at 11.[28]  A professional translator testified that many errors and omissions tainted Dr. Denkowski's use of a translator.[29]  Glen Dodson, the translator

---

[27]    The state habeas court's findings suggest that it placed little weight on Dr. Fletcher's testimony.  When Dr. Fletcher testified in the state habeas hearing, Maldonado's attorneys had only presented him with Dr. Denkowski's affidavit and testimony.  He initially did not testify with a full understanding of all the testing done on Maldonado.  Also, the state habeas court found that "he had never evaluated criminal offenders to determine mental retardation," was unfamiliar with Texas' approach to *Atkins* claims, and did not review all available material.  S.H. at 2505.  Maldonado called Dr. Fletcher, in part, to testify that the "Flynn Effect" would cause the results of the WAIS-III actually to be within the cut-off range for mental retardation.  "The Flynn Effect . . . posits that, over time, the IQ scores of a population rise without corresponding increases in intelligence and thus the test must be re-normalized over time.*"  In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007).  The state habeas court concluded that the Flynn Effect would not require Maldonado's IQ scores to dip below 70.  S.H. at 2506.  As the Flynn Effect "has not been accepted in [the Fifth] Circuit as scientifically valid," *Mathis*, 443 F.3d at 433 n.1 (citing *In re Salazar*, 443 F.3d 430, 433 n.1 (5th Cir. 2006)), the Court will not apply that theory to the results of Maldonado's WAIS-III testing.  *See Thomas v. Quarterman*, ___ F.App'x. ____, ___, 2009 WL 1971600 (5th Cir. 2009) (refusing to find unreasonable a state court decision not to apply the Flynn Effect to IQ scores).  In the end, the state habeas court found "unpersuasive Dr. Fletcher's assertion that the Flynn Effect mandates that [Maldonado's] IQ scores in the WAIS-III should be lowered to a score below 70."  S.H. at 2506.

[28]    Before the state evidentiary hearing, Maldoando submitted an affidavit from Dr. Luis R. Marcos, a professor of psychiatry at New York University School of Medicine.  Dr. Marcos reviewed the video of Dr. Denkowski's testing and concluded that the fact that he did not speak Spanish and used a translator "means that his conclusions should not be accepted in any way as an accurate measure of Mr. Maldonado's mental capacity."  S.H. at 2307.  Dr. Marcos also stated that "Dr. Denkowski applies his own cultural and lifestyle biases concerning Mexicans from rural environments to make unsubstantiated and arbitrary adjustments upward to his own test results . . . thus making his conclusions about Mr. Maldonado's mental capacity scientifically invalid."  S.H. at 2308.

[29]    That professional translator only reviewed a small portion of Dr. Denkowski's testing.
                                                                                                 (continued...)

51

that Dr. Denkowski used in his examination, testified that he had never translated a written psychological written instrument before the Maldonado examination.  S.H.R. Vol. 5 at 28.

Nevertheless, evidentiary hearing testimony reflected that the WAIS-III manual states:

> You may be similarly challenged when testing individuals who are not fluent in English or individuals for whom English is a second language. Experienced examiners have found several approaches useful, including administering the test with the assistance of a translator, using a translated version, if available, and administering it in the examinee's native language, or administering the test bilingually.  All of these methods may present problems in interpreting the score.  The WAIS-III normative data were collected on individuals who speak fluent English.

David Wechsler, WAIS-III ADMINISTRATION AND SCORING MANUAL 34 (3d ed. 2003).  Dr. Denkowski also provided an affidavit that cited articles in which Dr. Puente had endorsed the use of properly trained translators in psychological testing, favoring their use even over testing by Spanish-speaking psychologists.  S.H., State's Exhibit 51.  In sum, the evidence conflicted on whether the use of a translator would invalidate Dr. Denkowski's testimony.

The evidence in state habeas court also presented contradictory views on how mistranslation would affect an IQ score, if it did not completely invalidate it.  Dr.

---

[29]     (...continued)
S.H.R. Vol. 3 at 49.

Puente testified that problems with translation would tend to lower IQ scores.  S.H.R. Vol. 2 at 141.  Dr. Denkowski testified that "[a]nything that interferes with optimal performance on the test will suppress the IQ."  S.H.R. Vol. 3 at 86.  Dr. Denkowski opined that "[t]here are no recognized human factors that raise IQs spuriously."  S.H. at 1988.  Dr. Fletcher, however, testified that it was possible to have a higher IQ from translation errors.  S.H.R. Vol. 17 at 18.

*Use of "Clinical Judgment" to Inflate Raw IQ Score* - According to Dr. Denkowski, a psychological expert needs to make sure that a person's cultural or educational background "did not suppress the IQ."  S.H.R. Vol. 3 at 123.  On that basis, Dr. Denkowski testified that circumstances in Maldonado's background would inhibit his ability to score well on IQ testing.  Dr. Denkowski testified that his IQ would likely be higher than represented by a Full Scale Score of 72.  Dr. Denkowski conceded that only "clinical judgment," not any statistical formula or established methodology, informed how much to alter an IQ score because of cultural and educational factors.  S.H.R. Vol. 4 at 32.  Maldonado's cross-examination of Dr. Denkowski, however, seriously challenged whether his personal experience would allow him to make assumptions about the effect of Maldonado's Mexican heritage and poor, rural upbringing on the testing.

The testimony in state habeas court showed that the administration and scoring manual of the WAIS-III, however, says "[l]ow IQ score may and most often do reflect

a low level of intellectual functioning but other factors such as the following may be implicated.  Cultural or linguistic discrepancy from the test standardization table, distractability, anxiety, deafness, poor motivation, or inadequate persistence." S.H.R. Vol. 2 at 145.[30]  Nonetheless, Dr. Puente criticized Dr. Denkowski's use of cultural factors to reevaluate the IQ scores: "Age is the only variable that intelligence tests take into account to derive an IQ score.  Outside of age, intelligence tests yield IQ scores regardless of reason; the scores do not discriminate according to education, culture and ethnicity."  S.H. at 2150.  While Dr. Puente objected to that language because it smacks of "cultural racism," but he agreed that cultural factors influenced Maldonado's low IQ scores.  S.H.R. Vol. 2 at 146.

Dr. Weinstein provided an affidavit before the evidentiary hearing wherein he stated that psychology did not recognize Dr. Denkowski's practice of qualifying IQ scores based on "Maldonado's educational and childhood backgrounds."  S.H. at 2256.  He further stated that Dr. Denkowski's "testing . . . is severely flawed, and should not be considered a reliable test to base an IQ score.  His methods and techniques are not acceptable in the psychological profession, and his conclusions based on the test of Mr. Maldonado are not considered a valid index of [his]

---

[30]   Dr. Denkowski's opinion apparently reflects standard concerns in psychology: "Care should be taken to ensure that intellectual testing procedures reflect adequate attention to an individual's ethnic, cultural, or linguistic background."  DSM-IV-TR at 46.  Dr. Puente agreed that anxiety and stress could lower an inmate's performance on testing.  S.H.R. Vol. 2 at 142.

intellectual functioning."  S.H. at 2256.[31]

*State Habeas Findings Regarding the WAIS-III* - The state habeas court did not

explicitly render any finding or conclusion regarding the validity of Dr. Denkowski's

use of a translator.  The findings and conclusions, however, presumed that the WAIS-

III score was valid.  The state habeas court found, "assuming without deciding, that

the use of a Spanish translator impacted [Maldonado's] performance in the WAIS-

III," but that "such impact would most likely interfere with [his] optimal performance

---

[31]    Maldonado supports his request by actions taken by the Texas courts in *Ex parte Plata*, a
case where, as here, Dr. Denkowski examined a Spanish speaking inmate and found that
cultural factors suppressed his true IQ score.  The lower court in *Plata* placed "[n]o
evidentiary weight" on Dr. Denkowski's scores because he "invalidated the norms of the test
by committing errors in administration and scoring."  *Ex parte Plata*, No. 693143-B, at 14
(Doc. # 12, Exhibit F).  The district court in *Plata* found that Dr. Denkowski's lack of
Spanish proficiency made him unable to "assess the extent to which . . . responses were
affected by a failure to understand" and thus he "was not and is not qualified to evaluate Mr.
Plata for mental retardation."  *Ex parte Plata*, No. 693143-B, at 15-16.  The lower court also
found that it "is not generally accepted practice within the field of psychological assessment
to obtain an IQ score, declare it invalid, and then estimate an IQ score," especially where Dr.
Denkowski was "not versed at all in Spanish language or Mexican culture to justify use of
clinical judgment[.]"  "  *Ex parte Plata*, No. 693143-B, at 16, 21.  In sum, the lower court
found that "Dr. Denkowski's application of clinical assessment of IQ is poorly grounded in
terms of methodology, need, and application. . . . Dr. Denkowski has ignored the science
on intellectual assessment."  *Ex parte Plata*, No. 693143-B, at 22.  The Court of Criminal
Appeals held: "The trial court's findings of fact and conclusions of law are supported by the
record, and we adopt them as our own."  *Ex parte Plata*, 2008 WL 151296, at *1 (Tex. Crim.
App. 2008).  Maldonado wants the language from *Ex parte Plata* not only to discredit Dr.
Denkowski's test results, but also to discredit all his testimony.

Unlike in *Plata*, Dr. Denkowski here did not rely alone on cultural factors for which he had
no context.  While Dr. Denkowski relied on his clinical judgment when evaluating cultural
factors, he also based his elevation of Maldonado's true IQ score on anxiety and depression
– factors that he examined with presumably valid testing instruments.  Dr. Denkowski's
testimony did not specify how much the anxiety and depression, independent from other
factors, would have suppressed Maldonado's IQ.  Nonetheless, the state habeas court was
of the opinion that potential errors did not invalidate the test.  S.H. at 2500.

and suppress [his] IQ scores, resulting in WAIS-III scores that understate [his] actual mental ability." S.H. at 2502.

Having decided that the WAIS-III score was valid, the state habeas court then addressed whether factors would slant Maldonado's true IQ above that reflected in Dr. Denkowski's findings. Because IQ scores exist along a range, the WAIS-III would not facially exclude the possibility of mental retardation. A "confidence band" – the possibility of testing or measurement error – would potentially allow Maldonado's score to sink below 70.[32] The state habeas court found that, because cultural factors influenced Maldonado's test scores and the WAIS-III was normed to people with greater educational opportunities, his "score of 74 on the WAIS-III is consistent with [his] Verbal IQ score of 83 on the WAIS Espanol." S.H. at 2503.[33] The state habeas

---

[32]     The state habeas court observed:

> [T]he "confidence band" method is used to deal with the measurement error in IQ tests; that the attained IQ is viewed in terms of a range, rather than a discrete score; that the range consists of one or more standard error of measurement (SEM) units; that mental retardation professionals use 1.96 SEMs as the range to interpret IQ scores for important decision-making; and that 1 SEM equals 3 points on most intelligence tests, with 95% assurance that someone's true IQ falls within that range.

S.H. at 2500. The Fifth Circuit has stated that a state court is "not required to find [an inmate] to be mentally retarded merely because the low end of [his] confidence band was below 70, just as it would not be required to find that [he] could be executed on the basis that the high end of this band fell above 70." *Clark*, 457 F.3d at 446.

[33]     Because of the unfamiliarity with conventional education, the state habeas court found it incongruous to compare Maldonado with the peer group used to norm the WAIS-III, where "58% of the group had some college education, 29 % had bachelor degrees, 34% had a high
(continued...)

court recognized that Maldonado had little experience with education: "[Maldonado] attended school in Mexico only four or five years . . . sometimes slept in class . . . was not a good student . . . and began living on the streets when he was about nine years old." S.H. at 2499.  The state habeas court was concerned that the WAIS-III would not adequately measure the testing of someone, like Maldonado, who had little formal education.

The state court, however, seemed dubious that the lack of formal education came from mental retardation because Maldonado "reported that he did not have much interest in school[.]"  S.H. at 2499.  Even then, his time in a classroom when young belied his education: "he participated in about six months of adult education while in federal prison . . . taught himself to spell out words and read at a third- to fifth-grade competency . . . and . . . taught himself to perform arithmetic computations at a fourth- to fifth- grade proficiency."  S.H. at 2499.  Nonetheless, Maldonado's "minimal education and low-level reading, spelling and arithmetic level would suppress [his] Verbal IQ score when normed to a group with more education and factual knowledge, and that the Verbal portion of the WAIS-III contains vocabulary tests and questions" that are inappropriately based on cultural knowledge, "such as who wrote *Hamlet*, the reason for a parole system, and who is Martin Luther King."  S.H. at 2500.  Thus, the

---

[33]      (...continued)
          school education, and only 5% had an eighth-grade education or less."  S.H. at 2499.

state habeas court concluded that Maldonado had not shown significantly subaverage general intellectual functioning.   Instead, because of his "minimal amount of education and his criminal lifestyle, [his] poor academic functioning is consistent with the dynamics of lack of opportunity, underachievement, and poor life choices, rather than a lack of intellectual functioning[.]"  S.H. at 2525.

The state habeas court concluded that "nothing, other than practice effect[34] can result in an artificially high IQ but that certain factors, such as anxiety, depression, language problems, cultural deprivation, disadvantaged background, poor education, poor parenting, poor test-taking skills, and poor motivation can result in IQ scores that understate an individual's actual mental ability." S.H. at 2500 (footnote in original).[35] Because Dr. Denkowski administered testing to determine whether Maldonado was anxious or depressed at the time of examination, and Maldonado displayed mild to

---

[34]   "The Court finds that 'practice effect' is created by the same intelligence test being administered within a six-month or year period, a situation that did not occur in [Maldonado's] case." S.H. at 2500 n.3.

[35]   The AAMR's reasons for including measurement error in the reporting of IQ scores endorses the finding that anxiety and depression may have artificially lowered Maldonado's scores: "[V]ariation around a hypothetical 'true score' may be hypothesized to be due to variations in test performance, examiner's behavior, or other undetermined factors." AAMR 10TH at 57. Dr. Weinstein agreed that anxiety or depression can lower IQ testing performance. The AAMR 10TH also allows for the use of clinical judgment in assessing IQ scores, though it does so cautiously.  Clinical judgment based on "a high level of clinical expertise and experience . . . emerging directly from extensive data" informs the cognitive assessment process.  AAMR 10TH at 95.  "Clinical judgment should *not* be thought of as a justification for abbreviate evaluations, a vehicle for stereotypes or prejudices, a substitute for insufficiently explored questions, and excuse for incomplete or missing data, or a way to solve political problems."  *Id.*

moderate anxiety and moderate depression, the state habeas court found that Maldonado's "anxiety and depression could have likely caused [his] actual mental ability to be understated."  S.H. at 2500.

Maldonado asks this Court to disregard Dr. Denkowski's testimony and invalidate any state habeas findings based thereon.  Even so, the state habeas court did not rest its conclusions on Dr. Denkowski's interpretation of the WAIS-III score alone.  Recognizing the potential problems with Dr. Denkowski's examination, the state habeas court relied on Dr. Weinstein's partial administration of the WAIS-Español to find that Maldonado was not mentally retarded: "[A]ssuming without deciding that [Maldonado's] IQ scores on the WAIS-III are not considered . . . [Maldonado] failed to show significantly subaverage intellectual functioning based on his Verbal IQ score of 83 on the WAIS Espanol."  S.H. at 2507.  The Court, therefore, will review the evidence independent from Dr. Denkowski's WAIS-III score.

### The WAIS-Español

A Spanish version of the WAIS-III called the Escala Inteligencia Wechsler para Adultos ("WAIS-Español" or "EIWA") exists, though expert testimony questioned its usefulness throughout the spectrum of linguistic and cultural variations in Spanish

speaking countries.[36]  Dr. Weinstein, who speaks Spanish, only delivered selected portions of the WAIS-Español.  Dr. Weinstein, however, did not volunteer that he administered that test.  Dr. Denkowski discovered the WAIS-Español testing when researching Dr. Weinstein's testing protocol.  S.H.R. Vol. 3 at 109.  Dr. Weinstein never explained why he chose to administer that test, why he did not perform the entire test, or why he did not report his partial conclusions.

Maldonado scored an 83 on the verbal portion of the WAIS-Español, well above the range necessary for a diagnosis of mental retardation.  On the comprehension, similarities, and vocabulary subsections of the verbal portion, Maldonado scored a 90.  Dr. Denkowski testified that "the verbal part is the most difficult part for people with little schooling."  S.H.R. Vol. 4 at 25.  Dr. Denkowski explained why Maldonado scored higher on the verbal portion of the WAIS-Español than the WAIS-III:

> The WAIS Espanol verbal IQ was 83 and that indicates that in a . . . Hispanic cultural linguistic context . . . he would function at that level in terms of measured ability.  The verbal IQ on the WAIS-III indicates that in a context where Anglo cultural linguistic context when translated, he would function at 74.  . . . [T]he practical application would be back in the community interacting with other Hispanic folks he would be functioning at this higher 83 level.

S.H.R. Vol. 3 at 111.

---

[36]   Dr. Denkowski himself did not administer the WAIS-Español because of the "practice effect" which can skew IQ test scores upward if performed too soon after an initial test. S.H.R. Vol. 3 at 88.

Maldonado's experts pointed out problems with relying on the WAIS-Español score. Dr. Puente testified that the use of the WAIS-Español was problematic because it was normed for Spanish speakers from Puerto Rico, who may have linguistic differences from Maldonado's native Mexico.[37]  Dr. Fletcher also testified that the "WAIS Espanol, when compared to WAIS scores, give[s] scores that are substantially higher than those you would get on the WAIS."  S.H.R. Vol. 17 at 15.  The record, however, does not conclusively indicate the amount that the WAIS-Español may overstate IQ scores.[38]

The state habeas court relied on the score from the verbal section of the WAIS-Español in rejecting Maldonado's *Atkins* claim.  S.H. at 2507.  In particular, the state habeas court found that, even if translation problems invalidated the WAIS-III scores, Dr. Weinstein's WAIS-Español testing showed that Maldonado did not have

---

[37]     Dr. Puente explained in his affidavit: "The original Spanish translation or EIWA is over half a century old and there is significant literature which indicates that the test is significantly flawed due to failures in translation, standardization, and statistical analysis.  Hence, the test is rarely used due to its significant flaws."  S.H. at 2158.

[38]     Maldonado's federal briefing does not comprehensively discuss the WAIS-Español test or suggest how to interpret the resultant score that would disqualify Maldonado from a diagnosis of mental retardation.  Maldonado does not present any evidence to rebut Dr. Weinstein's scoring on the WAIS-Español. The clearest indication of why Dr. Weinstein did not mention the WAIS-Español in his report comes from Maldonado's proposed findings on state habeas review: "As the scientific literature and [WAIS-Español's] well-known standardization, translation, and obsolescence make clear, [it] has such significant flaws that its use is almost never 'appropriate.'"  S.H. at 2444.  That statement, however, does not explain why Dr. Weinstein administered the test – or a portion of it – and what its results mean.

significant subaverage intellectual functioning.  S.H. at 2507.

The state habeas court's decision, however, also provided for the possibility that neither the WAIS-III nor the WAIS-Español provided a legitimate measure of Maldonado's intellectual capacity.  As the second theory underlying its rejection of Maldonado's *Atkins* claim, the state habeas court found that Maldonado's evidence did not meet his burden of showing entitlement to relief.  Specifically, the state court held that Maldonado's

> scores on the Bateria-R, the Beta III, and the CTONI do not establish significantly subaverage intellectual functioning and are not accurate representations of [his] intellectual functioning, in light of [his] other reported higher IQ scores on tests that specifically measure intellectual functioning and in light of the unsuitability of the use of the Bateria-R, the Beta III, and the CTONI for measuring general intellectual functioning for the purpose of diagnosing mental retardation.

S.H. at 2507.  Even independent of the WAIS-III and WAIS-Español testing, the state habeas court concluded that the other testing instruments were an insufficient measure of general intelligence in the *Atkins* context.

### *The Beta-III and CTONI*

Dr. Antonio Puente, a professor of psychiatry for the University of North Carolina Wilmington who also maintains a private practice with an emphasis in neuropsychology, performed a range of testing on Maldonado in Spanish.[39]  Dr.

---

[39]   Dr. Puente administered over 20 neuropsychological tests to Maldonado.  Dr. Puente testified about the results of his test scores:

(continued...)

Puente is fluent in Spanish.  Dr. Puente tested Maldonado for neuropsychological deficiencies.   The state habeas court commented on his approach: "he first administered a screening test for [Maldonado] and found it normal" and then proceeded to "administer[] a battery of neuropsychological exams[.]"  S.H. at 2498. To come up with the IQ scores that facially fall within the range for mental retardation, Dr. Puente relied on two tests: the Beta-III and the Comprehensive Test of Nonverbal Intelligence ("CTONI").  Presumably because Dr. Puente administered both tests, the state habeas court entered findings that conjunctively discussed both instruments.

Dr. Puente described the Beta-III test as "a means to assess intellectual

---

39      (...continued)

Some are, quote, normal, which is not to imply they are perfect, they are at least not impaired.  Some are borderline, things are not necessarily in good shape.  And several are impaired[.]

His academic abilities, in terms of chronological age, is a little bit over 10 years of age.  So if you think about it in terms of how much knowledge he does have, academically it's about 10 years.

In terms of grade, it's about five years of education, which is actually substantially more than his actual academic achievement, which is about two years of actual academic achievement.

Then two test of intellectual abilities which develop IQ of 62 to 70.  So you come up with a generic average, 66.

So we have an individual who has mild mental retardation that is largely fueled by limited academic abilities and neuropsychological defects.

S.H.R. Vol. 2 at 79-80.

functioning in individuals who were illiterate, who did not read English." S.H.R. Vol. 2 at 84.  Dr. Puente explained in his report that the Beta-III "is one of the oldest intelligence tests in the world, with instructions in Spanish and an over-sampling of Hispanic individuals for normative purposes.  The test measures intelligence using a variety of non-verbal methods."  S.H. at 2158.  Dr. Puente agreed with a description of the Beta-III as a "quick assessment of adults" that tests "nonverbal intellectual abilities[.]"  S.H.R. Vol. 2 at 131.  Dr. Puente opined that the Beta-III was particularly well-suited to this examination because "the instructions are in Spanish, the norms include a strong representation of Hispanics living in the United States and research is still being done with the test."  S.H. at 2158.  Dr. Puente reported "[t]he Beta-III yielded an IQ of 70."  S.H. at 2158.  Dr. Puente agreed that Maldonado's score of 70 on the Beta-III did not qualify him for a diagnosis of mental retardation.  S.H.R. Vol. 2 at 127.[40]

The State argued in state habeas court that the Beta-III was not an adequate instrument for assessing mental retardation.  Dr. Denkowski testified that "You cannot establish general intellectual functioning through neuropsychological tests."  S.H.R. Vol. 3 at 69.   According to Dr. Denkowski, the Beta-III "is a brief screening

---

[40]     While the standard error of measurement places IQ scores derived from the WAIS-III along a range, Dr. Puente first testified that he did not "know the confidence intervals for the Beta," though in his testimony he referenced the standard error of measurement for the WAIS-III.  S.H.R. Vol. 2 at 88.

instrument and it's usually given to see if follow-up testing is needed with a test of general intelligence."   S.H.R. Vol. 3 at 97.[41]   Dr. Denkowski testified that neuropsychological testing is done only to uncover "underlying brain damage," not general intelligence.  S.H.R. Vol. 3 at 113.  Maldonado's own expert Dr. Fletcher testified on cross-examination that the Beta-III is an insufficient instrument to derive a full scale IQ score.  S.H.R. Vol. 17 at 19.

Dr. Puente selected the CTONI to test Maldonado because it allowed evaluation of a non-English speaker.  S.H.R. Vol. 2 at 86.  Dr. Puente affirmed that the CTONI "measures reasoning and judgment abilities and generates an intelligent quotient." S.H. at 2158.  In this case, Dr. Puente felt that the CTONI was important to use because it "can be administered without verbal instructions, was developed for non-English speakers and includes over-representation of Hispanics living in the United States in the norms."  S.H. at 2158.

On cross-examination, Dr. Puente conceded that the CTONI is only designed for use when "the examiner is reasonably certain that the prospective test taker . . . has sufficient experience with test procedures that a valid score is possible[.]"  S.H.R. Vol. 2 at 133.  However, Dr. Puente explained: "I thought after several hours of interview and four other tests, that I could probably be able to determine if this individual was

---

[41]   Dr. Puente would not characterize the Beta-III as a "screening device," but clarified that it gave a "quick assessment of adults ages 16 to 69 years, nonverbal intellectual abilities[.]" S.H.R. Vol. 2 at 131.

comfortable with a test procedure." S.H.R. Vol. 2 at 134. Dr. Puente, assumed that the pervious testing by Dr. Denkowski and Dr. Weinstein showed that Maldonado was "comfortable with a test procedure." S.H.R. Vol. 2 at 134.

Dr. Denkowski criticized the use of the CTONI as a means to measure IQ. He testified that the CTONI is "a unique test so the developers cite a lot of precautions about who to give this test to and who not to give it to." S.H.R. Vol. 3 at 99. According to Dr. Denkowski, the usefulness of the CTONI is limited because the test taker "need[s] to have some exposure to the idea of testing and to dealing with abstractions and dealing with the sort of content, unique content that this test uses. And, specifically, illiterate types of persons have a very hard time with that." S.H.R. Vol. 3 at 99. Dr. Denkowski testified that both the Beta-III and the CTONI were irrelevant to the mental retardation inquiry because they did not have a verbal component. S.H.R. Vol. 3 at 103. Dr. Fletcher agreed that the CTONI could not be used to derive a full scale IQ. S.H.R. Vol. 17 at 19.

Dr. Puente considered that the result of his neurological testing, including the Beta-III and CTONI, rendered scores for Maldonado in the mild mental retardation range. S.H. at 2162-63. Dr. Puente averaged the Beta-III and CTONI scores to "come up with a generic average, 66." S.H.R. Vol. 2 at 80; *see also* S.H.R. Vol. 2 at 83. Dr. Puente asserted that the scores "were technically in the mild retardation range, at least one of them is, and when you combine them and come up with a mean, one could

66

argue they are significantly subaverage."  S.H.R. Vol. 2 at 84. [42]

Dr. Puente argued that the Beta-III and CTONI adequately measured general

intelligence.  Dr. Puente's affidavit asserts:

> Dr. Denkowski's interpretation of appropriate intelligence tests argues that the Beta-III and the TONI [sic] are not acceptable tests of intelligence.  This claim is incorrect.  The Beta yields a scientifically derived and validated intelligence quotient using five subtests that tap different aspects of non-verbal aspects of intelligence.  Therefore, the Beta yields an overall or comprehensive IQ.  The TONI [sic] is sometimes used as a screening of intelligence but as the name indicates the CTONI is a comprehensive test of non-verbal intelligence which is also scientifically derived and validated.  The CTONI similarly yields a valid IQ based on a composite of six different tests.  A valid IQ score may be obtained from a variety of scientifically validated intelligence tests (including the Beta, CTONI, and the WAIS).  A Full Scale Intelligence Quotient is most often associated with the final IQ obtained with the WAIS (as well as its age related counterparts such as the WISC) but it is a term that is not used by most intelligence tests.  The most common term is simply intelligence quotient or IQ.

SH. at 2150-51.

The state habeas court generally concluded that the CTONI and Beta-III are not

"well-suited for determination of intellectual functioning for purposes of diagnosing

---

[42]  The testimony in this cases did not verify the validity of this methodology.  It is unclear how test results that do not allow for a diagnosis of mental retardation (such as the Beta-III in this case) can support such a diagnosis by merely averaging their score with one from a different, and lower scored, test.  This approach is especially confusing because Dr. Puente reported that psychologists do not apply a confidence band to Beta-III testing.  S.H.R. Vol. 2 at 87-88.  The same approach would justify averaging the scores from all Maldonado's testing –83, 72, 70, 61, and 61 – to come up with a mean score of 69.4, barely below the threshold for retardation.  Logically, the Beta-III scores should either support or disprove mental retardation, irrespective of other testing.  *See Green v. Johnson*, 515 F.3d 290, 300-01 (4th Cir. 2008) (holding that it was not unreasonable for a state court to find that a prisoner's I.Q. exceeded 70, when he scored above 70 on some tests but below 70 others).

mental retardation." S.H. at 2525. Based on Dr. Denkowski's testimony, the state habeas court was skeptical that the CTONI or Beta-III could accurately inform the *Atkins* inquiry: "neuropsychological testing does not appear in the AAMR manual as relevant to a diagnosis of mental retardation and . . . general intellectual functioning cannot be established through the use of neuropsychological testing, rather than the administration of instruments measuring general intellectual functioning." S.H. at 2504. The state habeas court in particular rejected the Beta-III test score because it "is a nonverbal, brief screening test usually given to determine if follow-up testing needs to be done with tests of general intelligence[.]" The state court also found that "the CTONI is a nonverbal test that its developers caution should not be given to a person unless the examiner is reasonably certain the person had sufficient experience with test procedures so that a valid score is possible." S.H. at 2503. The state habeas court also discounted the CTONI score because Maldonado's "minimal education and lifestyle renders it unlikely that [he] is proficient with test-taking procedures." S.H. at 2503.

Even if the state habeas court chose not to discount Dr. Puente's testing, it found that not all of his results would support Maldonado's *Atkins* claim: "[Maldonado's] tests for attention and semantic fluency were normal; that [his] test for phonetic fluency was borderline; that [his] test for figural fluency was moderately impaired; and that a non-mentally retarded person could take these test and do well

68

in some areas and not do well in other areas."  S.H. at 2498.

### *Bateria-R*

Along with several other tests, Dr. Weinstein administered the Woodcock-Muñoz Bateria-R ("Bateria-R"), the Spanish language of the Woodcock-Johnson Test of Cognitive Abilities, Revised.  On the basis of the results, Dr. Weinstein opined that Maldonado may be mentally retarded.  Dr. Weinstein's declaration reports that Maldonado received an IQ score of 61, a result facially making him eligible for a diagnosis of mental retardation.  S.H. at 82.  Specifically, "his cognitive functioning is in the Mentally Retarded range and is the equivalent to that of a child at age seven years ten months, as measured by the Woodcock-Muñoz Battery.  He obtained a Standard Score (IQ) of 61.  This score is below the 1st percentile rank, and more then [sic] two standard deviations below the mean."  S.H. at 82.  Dr. Weinstein also asserted that Maldonado's lack of adaptive behaviors confirmed the validity of his low score.

Dr. Weinstein could not identify the etiology of Maldonado's intellectual deficiencies.  He speculated, however, that Fetal Alcohol Syndrome, neglect, physical abuse, alcohol consumption in his infancy, head injuries, or exposure to toxic substances could have caused neurological damage, resulting in mental retardation.

Dr. Denkowski testified that the AAMR has not cited the Bateria-R as a predicate test to the evaluation of mental retardation and "[i]t's not well suited for that

69

purpose, although you can use it for that." S.H.R. Vol. 3 at 105. Dr. Denkowski opined that the usefulness of the test was impaired because it "is used by school psychologists to diagnose learning disabilities and it measures a lot of things like visual and auditory processing. It really measures very little in terms of general intelligence." S.H.R. Vol. 3 at 106. Even so, Dr. Denkowski reviewed Dr. Weinstein's testing protocols and found that Maldonado's performance suggested that he was not mentally retarded: "he did well on the things that mentally retarded people do poorly on and did poorly on the things that mentally retarded people did well on." S.H.R. Vol. 3 at 107. Specifically, people with mental retardation have difficulty with visual matching and memory activities, but Maldonado's performance was "within the normal range for average people." S.H.R. Vol. 3 at 107-08. Dr. Denkowski thought that the Bateria-R test score was especially suspect because it was inconsistent with Dr. Weinstein's administration of the WAIS Español in which Maldonado scored well above the range for mental retardation. S.H.R. Vol. 3 at 108. Dr. Denkowski also discounted the Bateria-R score because it was not consistent with Maldonado's skills. He opined: "His vocational background, ability to execute armed robberies and avoid arrest, and the remaining test data indicate that his general intellectual functioning is considerably more proficient." S.H. at 2007.

The state habeas court dismissed the Bateria-R score because it "is not one of the tests the AAMR cites for mental retardation evaluation," but instead "is generally

used by school psychologists to diagnose learning disabilities" and, in fact, "is not very relevant for establishing general intellectual functioning, so it is not well-suited for determination of the first prong . . . to determine mental retardation." S.H. at 2501. Even considering the test to be a valid indicator of mental retardation, the state habeas court found "inconsistency in [Maldonado's] performance" on the test because he "did well on things on which mentally retarded persons do poorly, and . . . did poorly on things on which mentally retarded persons do well." S.H. at 2501.

### AEDPA Review of the State Court Adjudication on Intellectual Functioning

Having reviewed the psychological testing and resultant state adjudication, the Court must determine whether Maldonado has shown that he merits federal habeas relief. As previously noted, the state court's decision in this case rested on two predicates. First, the discrete test scores that Maldonado received on testing instruments that measured general intelligence (the WAIS-III and the WAIS-Español) did not show significantly impaired cognitive functioning. Second, the tests that Maldonado used to establish retardation – the Bateria-R, the Beta-III, and the CTONI – were categorically insufficient to establish impaired intellectual functioning and did not produce scores that accurately reflected Maldonado's mental abilities.

This case raises the touchstone question of how a State should determine eligibility for mental retardation under *Atkins*. The state habeas court heard conflicting testimony about the method by which competent psychologists identify

71

significantly subaverage intellectual functioning.  Psychologists on both sides gave testimony about their profession's acceptance of certain testing instruments as sufficient barometers of intelligence.  To summarize, Dr. Denkowski considered the Bateria-R, the Beta-III, and the CTONI as superficial and deficient means by which to assess general intelligence.[43]  Maldonado's expert, Dr. Fletcher, agreed that the Beta-III and the CTONI did not produce a full scale IQ score.[44]  The other experts, however, defended the neuropsychological tests as a valid way to ascertain Maldonado's level of general intelligence.  In sum, the experts were conflicted on the administration and interpretation of the testing instruments.

The Supreme Court did not establish one discrete approach for deciding who falls under *Atkins*' protection, much less sanction one particular testing instrument or methodology for giving effect to that ruling.  The record in this case gives mixed signals about the psychological profession's reliance on different tests for measuring intelligence.  Even given the conflicting testimony by experts, the state habeas court provided detailed reasons for discounting the scores from the Bateria-R, the Beta-III, and the CTONI.  In essence, the state habeas court found that Maldonado's experts

---

[43]    The AAMR manual lists the CTONI under a section entitled "test for special circumstances," describing the test as one "to be used to assess intellectual abilities of individuals for whom most other intelligence tests are inappropriate or possibly biased."  AAMR 10TH at 64-65. The AAMR 10th does not mention the Beta-III as a test of general intelligence.

[44]    Dr. Fletcher did not have an opinion on Maldonado's IQ level.  S.H.R. Vol. 17 at 40.

had not chosen testing instruments that could reach the core concerns identified by *Atkins*.

In the end, it is not this Court's role to constitutionalize one method of psychological testing. Even given the extensive testimony in this case, this Court cannot prescribe to the psychological profession which of its tests are a valid and comprehensive measure of intelligence. Instead, this Court's review under the AEDPA is a narrow one: was the state court's legal determination contrary to, or an unreasonable application of, federal law? In making that assessment, the Court must evaluate the integrity of the underlying state court factfindings, but with a presumption that they are correct unless sufficiently rebutted. 28 U.S.C. § 2254(e)(1).

Here, the state habeas court held a full, comprehensive hearing on Maldonado's *Atkins* claim. In resolving the *Atkins* issue, the state court only cautiously accepted Dr. Denkowski's administration of the WAIS-III. Much of the testimony by Maldonado's experts and his arguments on federal review seek to discredit and disqualify Dr. Denkowski as an expert. Indeed, Maldonado wants the Court to ignore his testimony in its entirety. Even setting aside the question of whether psychological principles would endorse Dr. Denkowski's theory that various factors lowered Maldonado's IQ scores, the testimony was conflicting about whether the state habeas court should have completely disregarded the WAIS-III score. Dr. Puente's testimony generally corroborated Dr. Denkowski's belief that any translation error would only

73

artificially lower his IQ score, though Dr. Weinstein and Dr. Fletcher opined otherwise.  At best, Maldonado has shown a disagreement among professionals about testing methodology; he has not shown that Dr. Denkowski's testimony on that basis was wrong.[45]  Given the testimony in the evidentiary hearing, the state habeas court was not unreasonable in using Dr. Denkowski's testimony in deciding the *Atkins* issue.

Discrediting Dr. Denkowski's test scores does not in itself provide for a sufficient basis for habeas relief on Maldonado's *Atkins* claim.  The state court's adjudication denied relief independent of Dr. Denkowski's testing, possibly in recognition the concerns raised by Maldonado's experts.  As acknowledged by the state habeas court's alternative basis for rejecting the *Atkins* claim, habeas relief only becomes available to Maldonado after he points to affirmative evidence that places his IQ score in the range eligible for a diagnosis of mental retardation.  He then must prove retardation under a preponderance standard in light of the entire record.  The state habeas court found that Maldonado did not meet his burden of proving mental

---

[45]     Disagreement among experts is an insufficient basis to rebut the state habeas court's reliance on his testimony as credible.  *See Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) ("[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear."); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts." (quoting *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir. 1999)).

retardation, a decision afforded deference under the AEDPA.

While facially presenting scores that may qualify for a psychological diagnosis of mental retardation, Maldonado has not shown that the Beta-III, CTONI, and Bateria-R tests would adequately uncover those deficiencies that make individuals suffering from mental retardation ineligible for execution. States have a valid interest in a deep and probing inquiry, not a superficial peek into possible mental deficiency, before disrupting a judgment rendered by a jury. The Supreme Court identified those characteristics common to mentally impaired offenders that make them less culpable: "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318; *see also id.* at 320 (identifying that the same factors "make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information."). The testimony in state habeas court did not have much confidence that the Beta-III, CTONI or Bateria-R would ferret out whether an individual's cognitive abilities were impaired in the same way as anticipated by *Atkins*. In particular, the evidentiary hearing testimony questioned whether those testing instruments adequately assessed Maldonado's verbal skills (or ability "to communicate" as suggested by *Atkins*), an area in which he was apparently proficient. The results of other tests performed by the experts generally corroborated

Dr. Denkowski's opinion that Maldonado is not mentally retarded.[46]

---

[46]    The experts in this case performed neuropsychological testing that was not designed to produce an IQ score. Dr. Puente performed a battery of neuropsychological testing, including an initial screening instrument which showed "normal function[ing]." S.H.R. Vol. 3 at 113. At that point, Dr. Denkowski testified that it was "pointless" to do any more testing "once the screening told you there was no underlying brain impairment." S.H.R. Vol. 3 at 117. Of the 19 tests Dr. Puente performed afterward, 13 were "in the normal range." S.H.R. Vol. 3 at 115. Dr. Denkowski testified that "normal screening test tells you that it's highly unlikely that there is any underlying brain damage, so there would be no reason to administer additional tests." S.H.R. Vol. 3 at 113. While Dr. Puente used Maldonado's score on a figure fluency test to find Maldonado mentally impaired, a similar test performed by Dr. Weinstein "came out normal." S.H.R. Vol. 3 at 115-16. Another similar test performed by Dr. Puente had results which fell in the normal range. S.H.R. Vol. 3 at 116. Dr. Puente agreed on cross-examination that a person without mental retardation could do well on some portions of his testing battery and not others, similar to Maldoando's results. Dr. Puente also performed a Visual Retention Test in which he scored Maldonado "as significantly impaired" because he could not perform the test at all. Dr. Denkowski, however, suspected irregularities: "mildly to moderately retarded adolescents attain a score of at least 4 on this. There was a problem here. I don't know what it was but that cannot be a reliable indicator of underlying brain impairment." S.H.R. Vol. 3 at 117.

Dr. Denkowski also administered several neuropsychological tests. Dr. Denkowski testified that the "median score . . . was between 81 and 83." S.H.R. Vol. 3 at 118. Dr. Denkowski opined that the neuropsychological testing showed that "none of the risks of brain damage to which he may have been exposed (*e.g.*, alcohol ingestion as a child, exposure to pesticides and insecticides as an adolescent, and numerous alleged head-injuries) actually induced brain damage. Moreover, absence of brain abnormalities reduces the likelihood that he is mentally retarded." S.H. at 1995.

Dr. Weinstein delivered a battery of neuropsychological tests on Maldonado in three separate sessions. Dr. Weinstein's report indicates that the administered the following tests: Category Test; Finger Tapping Test; Rey Osterrieth Complex Figure Test; Wisconsin Card Sorting Test; Woodcock-Muñoz Psycho-Educational Battery-Revised (Bateria Woodcock-Muñoz); the Bateria Neuropsicologica en Español; Delis-Kaplan Executive Function System; Verbal Fluency Test; Trail Making Test; Design Fluency Test; and Tower Test. S.H. at 75. Dr. Weinstein stated that he had "been asked by post-conviction counsel for Virgilio Maldonado to perform a neuropsychological evaluation of their client to determine the presence and severity of any organic defects, if any, and if so, render an opinion as to whether and how such impairments affect Mr. Maldonado's cognitive functioning." S.H. at 75. Though Dr. Weinstein did not specifically describe why he used neuropsychological tests, rather than tests of general intelligence, to evaluate whether Maldonado had mental retardation, Dr. Denkowski noted that it was probably because "professional literature

(continued...)

The state habeas court's failure to honor the test scores from Maldonado's experts finds support in a broader look at Maldonado's life. The state habeas court engaged in an all-inclusive, holistic review in finding that Maldonado had not demonstrated that he suffered from significant subaverage intellectual functioning. The state habeas court did not limit its consideration to the testimony of mental health experts, but weighed Maldonado's mental retardation claim against testimony about how he functioned in society. *See Hall v. Quarterman*, 534 F.3d 365, 395 (5th Cir. 2008) (cautioning not "to commit the ultimate decision of mental retardation to the experts" alone). In that way, the state habeas court looked at what psychologists said about Maldonado's intelligence and then compared that to what Maldonado could do. The state habeas court relied, in part, on the evidence showing Maldonado's behavior and characteristics inconsistent with an IQ that would fall below 70. S.H. at 2525.[47]

---

[46]  (...continued)
indicates that post-mortem autopsy studies of mentally retarded persons have found a 83% to 97% incidence of brain abnormalities." S.H. at 1994. According to Dr. Denkowski's review of that testing, "on a preponderance basis, Mr. Maldonado's neuropsychological functioning falls within normal limits." S.H. at 1994. In fact, Dr. Denkowski testified that the whole of Dr. Weinstein's neuropsychological testing indicated that Maldonado was not mentally retarded. S.H.R. Vol. 3 at 118.

[47]  This approach does not necessarily conflate the two prongs of the *Atkins* analysis, but recognizes that a subaverage IQ will manifest itself in the way that people adapt to the world around them. In *Ex parte Briseno*, the Texas Court of Criminal Appeals identified several evidentiary factors relevant to determining mental retardation. The state habeas court used the *Briseno* factors to show that Maldonado's life did not exhibit the distinguishing characteristics of mental retardation and used his "adequate adaptive behavior skills" to bolster its finding that he did not have significantly subaverage intellectual functioning." S.H. at 2525. *Briseno* specifically identified factors which "factfinders in the criminal trial
(continued...)

77

The testimony from Maldonado's experts characterized him as someone with unmistakably low intelligence. Dr. Weinstein, for instance, opined that Maldonado's mental ability was equal to that of a seven-year-old child. Dr. Puente found his functioning was equivalent to that of a ten-year-old. If in fact mentally retarded, Maldonado's life, independent of the psychological test results, should manifest a markedly low level of intelligence. Maldonado's life, however, belies such pervasive mental impairment.

The state habeas court specifically noted that no one considered Maldonado mentally retarded, either as a youth or as an adult. S.H. at 2521. The state court extensively reviewed how Maldonado's behavior – in the free world, in prison, and in the pursuit of criminal enterprise – displayed planning, forethought, and socially appropriate behavior. The findings reflect a belief that, notwithstanding his poor, neglected, and uneducated background, Maldonado was able to function in society

---

47    (...continued)
context might also focus upon in weighing evidence as indicative of mental retardation" *Briseno*, 135 S.W.3d at 8. While the context of the *Briseno* opinion suggests that those factors would only apply to the adaptive-behaviors inquiry, the Court of Criminal Appeals has elsewhere noted that the *Briseno* factors are "relevant to the three prongs" of the mental-retardation inquiry. *Neal v. State*, 256 S.W.23d 264, 273 (Tex. Crim. App. 2008); *see also Hunter*, 243 S.W.3d at 666 (designating the *Briseno* factors as "indicative of mental retardation"); *Ex parte Modden*, 147 S.W.3d 293, 296 (Tex. Crim. App. 2004) (applying the *Briseno* factors). In reality, the *Briseno* factors provide guidance to the Court of Criminal Appeals' mandate that "[t]he ultimate issue of whether a defendant is mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility." *Gallo v. State*, 239 S.W.3d 757, 777 (Tex. Crim. App. 2007).

beyond the anticipated capability of a mentally deficient person.  In particular, the state habeas court found that the instant murder and other criminal actions by Maldonado "required forethought and planning and complex execution of purpose." S.H. at 2521-23.  The state habeas court noted that, while functionally illiterate before his federal incarceration, Maldonado "taught himself to spell out words and read at a third- to fifth-grade competency . . . and taught himself to perform arithmetic computations at a fourth- to fifth- grade proficiency."  S.H. at 2499.  The state habeas court's review of Maldonado's life suggests that the psychometric instruments likely failed to appreciate his true cognitive ability.

To that end, the state habeas court concluded: "Based on [Maldonado's] minimal amount of education and his criminal lifestyle, [his] poor academic functioning is consistent with the dynamics of lack of opportunity, underachievement, and poor life choices, rather than lack of intellectual functioning and does not establish significantly subaverage intellectual functioning."  S.H. at 2525.[48]  Viewing all the evidence before the state habeas court, it is clear that Maldonado's intelligence falls below the average.  However, his life does not necessarily reflect actions by one with substantially impaired cognitive functioning.  The Court finds that the state

---

[48]    Even then, the state habeas court apparently felt that the WAIS-III testing failed to capture his full cognitive ability.  The state habeas court found that his "minimal education and low-level reading, spelling and arithmetic level would suppress [his] Verbal IQ score when normed with a group with more education and factual knowledge[.]"  S.H. at 2499.

habeas court was not unreasonable in finding that Maldonado did not prove that he suffered from significant substantial limitations in intellectual functioning.

### 2.   Adaptive Behavior

Even if Maldonado could prove that his IQ fell within the range of scores allowing for mental retardation, "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills[.]" *Atkins*, 536 U.S. at 318.  While the failure to show an IQ below 70 dooms Maldonado's *Atkins* claim, *see Clark*, 457 F.3d at 446, out of an abundance of caution, the Court will consider whether Maldonado has met the adaptive behavior prong.

The adaptive behavior prong is the most fact-intensive, and subjective, part of the mental retardation inquiry.[49]  Three main sources of information guided the experts' testimony and the state court's review on the second prong of the *Atkins* test: (1) lay testimony from those who have associated with Maldonado both inside and outside of prison; (2) self-reporting by Maldonado of his cognitive failings; and (3) Dr. Denkowski's administration of a testing instrument to gauge Maldonado's skills. The parties now dispute whether what Maldonado can do (as opposed to what he cannot) should factor into the *Atkins* decision and whether Dr. Denkowski's based his adaptive behavior scoring on sound psychological principles.

---

[49]   The AAMR defines adaptive behavior as "the collection of conceptual, social, and practical skills have been learned by people in order to function in their everyday lives."  AAMR 10TH at 41.

### *Expert Testimony on Adaptive Behavior*

To summarize the expert testimony succinctly, Dr. Denkowski administered the Adaptive Behavior Assessment Scale ("ABAS") to Maldonado in May 2005.  The ABAS asks the subject whether he can perform certain tasks or skills.  He rates his own abilities from 0 (the skill cannot be performed) to 3 (the skill is almost always performed correctly) on 239 skills.  The examiner then tabulates the answers into a composite score that, if below a certain number, shows deficits in adaptive behavior.  Through an interpreter, and in a manner Maldonado strongly challenges, Maldonado answered questions in a way that would facially allow for mental retardation, but then only by a few points.  Dr. Denkowski, however, then revised Maldonado's scores in accordance with what he felt Maldonado was truly capable of performing.  Dr. Denkowski altered the results based on inaccuracies, background factors, and lifestyle choices.  The resultant score would make Maldonado ineligible for a diagnosis of mental retardation.  The state habeas testimony from different witnesses conflicted on the validity and integrity of Dr. Denkowski's administration of the test.

Dr. Puente challenged Dr. Denkowski's results.[50]  Dr. Puente criticized the use of the ABAS because it was not written in Spanish.  Also, the test was intended to evaluate high functioning individuals.  Dr. Puente felt that the test was not intended

---

[50]      Dr. Weinstein's affidavit did not discuss the adaptive behavior prong.

81

for adults like Maldonado.  S.H.R. Vol. 2 at 94-95.  As with Dr. Denkowski's WAIS-III testing, Dr. Puente also strenuously objected to the use of cultural factors to alter the testing results.

Dr. Puente himself found adaptive deficits based on Maldonado's history.  In doing so, he did not use any testing instrument but reviewed affidavits prepared by Maldonado's father and others who knew him.  From those affidavits, Dr. Puente concluded that Maldonado had "numerous" deficits, including functional academics, banking, public transportation, leisure, and social relationships.  S.H.R. Vol. 2 at 92-93.

Dr. Fletcher opined that the ABAS should have been performed by a native Spanish speaking psychologist.  He also feared that Maldonado was not high functioning enough to self-report his answers on the ABAS, though he himself had not examined Maldonado.  He also agreed with Dr. Puente that Dr. Denkowski's adjustment of Maldonado's scores was inappropriate, especially insofar as Dr. Denkowski relied on cultural factors in which he had no expertise.[51]

The different approaches taken by the experts in assessing Maldonado's

---

[51]    Maldonado also draws the Court's attention to a complaint filed by the Texas State Board of Examiners of Psychologists in the State Office of Administrative Hearings which alleges that Dr. Denkowski violated psychological standards in *Plata*.  (Doc. # 19).  Maldonado, however, has not described the genesis, resolution, or future impact of this action.  The complaint only asks for an administrative law judge to hold a hearing; Maldonado has not shown that Dr. Denkowski has been officially reprimanded or punished, though the complaint does raise various issues that could impeach his credibility.

adaptive skill areas highlights the subjectivity that seems to permeate a review of mental retardation's second prong.  The Texas Court of Criminal Appeals has sagely noted that "what constitutes mental retardation in a particular case varies sharply depending upon who performs the analysis and the methodology used." *Briseno*, 135 S.W.3d at 13.  In many cases, "experts [have] relied upon the same evidence and objective data to support their conclusions, yet the defense expert diagnosed mental retardation while the State's expert found no mental retardation[.]" *Id.*  Simply, "[t]he defense expert sees the glass half-empty, the State's expert sees the glass half-full." *Id.*[52]

Maldonado makes much of deficiencies in Dr. Denkowski's approach in testing for adaptive behavior.  The state habeas court did discuss Dr. Denkowski's testing at length.  Its conclusion in this case, however, stands independent of his examination.  While Dr. Denkowski's ABAS testing was obviously important to the state court, it

---

[52]     One judge on the Court of Criminal Appeals has observed:

> As school children we were taught that King Solomon weighed all of the evidence before him and made a reasoned decision; Nero divined merit on a whim and just pointed his thumb up or down. I fear that, under *Atkins* and the subjective legal definition of the "adaptive deficits" prong of mental retardation, we are moving farther from King Solomon and closer to Nero. . . . I fear there is no such bright line. There is, on the contrary, broad agreement among mental health experts that determining whether a person suffers from the type and level of "adaptive deficits" that qualifies for a mental retardation diagnosis is highly subjective and largely a matter of individual judgment.

*Ex parte Rodriguez*, 164 S.W.3d 400, 406 (Tex. Crim. App. 2005) (Cochran J., concurring).

83

did not rest its rejection of his *Atkins* claim on that basis.  The state habeas court clearly specified in its conclusion that behavior skill scales are not well-adapted to the *Atkins* context, and then found Maldonado's attempt to show the second prong lacking on different grounds, primarily from lay testimony.

### *Lay Accounts of Adaptive Behavior*

In reviewing the lay testimony, the state court relied on a template that the Court of Criminal Appeals established in *Briseno* to decide whether the offender is "mentally retarded for purposes of the Eighth Amendment."  The evidentiary factors identified in *Briseno* are:

- Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital murder, did the commission of that offense require forethought, planning and complex execution or purpose?

*Briseno*, 135 S.W.3d at 8-9.  The state habeas court concluded that each of these factors pointed away from a diagnosis of Maldonado's mental retardation.  Here, the state habeas court concluded:

> Based on the unreliability of using traditional adaptive behavior scales on the adult criminal applicant, based on [Maldonado's] possession of skills for which traditional adaptive behavior do not credit, based on [his] records at TDCJ-CID, and based on [his] demonstrated abilities to care for himself, to carry out plans, to respond rationally and appropriately to external stimuli (albeit in a socially unacceptable manner), to respond coherently, rationally, and on point to questions, to lead and manipulate others, to lie for his own interests, and to commit a capital murder and extraneous offenses that required forethought, planning and purpose, [Maldonado] fails to show by a preponderance of evidence that he has deficits in adaptive behavior.

S.H. at 2526.  The state court's own interpretation of the lay testimony ultimately guided its review of the second *Atkins* factor.

Before turning to the lay accounts of Maldonado's background, the Court notes two differences between the approach taken by Maldonado's experts and that sanctioned by *Briseno* in reviewing adaptive behavior.  First, Maldonado's experts looked for deficits in Maldonado's life primarily before age 18, while *Briseno* allows for examination of contemporaneous adaptive behavior.  For instance, although Dr. Puente gave his personal opinion that the developmental period extended throughout an individual's life, his adaptive-behaviors analysis largely focused on Maldonado's life before age 18 (although he mentioned some deficits in his adult life).  The *Briseno* factors, with the exception of the first which looks at the "developmental stage," allow

review of adaptive behaviors during adulthood.   Given the Supreme Court's pronouncement in *Roper v. Simmons*, 543 U.S. 551 (2005), that the Constitution prohibits the execution of those who murder under age 18, the final *Briseno* factor ("did the commission of that offense require forethought, planning and complex execution or purpose") explicitly looks at adult behavior.

While *Atkins* acknowledged the psychological profession's requirement that the onset of mental retardation occur before age 18, the Supreme Court did not exclude adult behavior from the evidentiary equation.   In fact, many of the concerns raised by the *Atkins* Court – the "possibility of false confessions," "lesser ability . . . to make a persuasive showing of mitigation," lessened "abl[ity] to give meaningful assistance to their counsel," and characteristics as "typically poor witnesses" and "unwarranted impression of lack of remorse" by those with mental retardation – are factors contemporaneous with trial.  *Atkins*, 536 U.S. at 320-21; *see also Webster*, 421 F.3d at 313 n.15 (looking at adaptive behavior before an inmate's 18th birthday).   Other courts have recognized that "[t]hough the factors state that the problems had to have manifested themselves before the defendant reached the age of eighteen, it is 'implicit' that the problems also existed at the time of the crime."  *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009).[53]

---

[53]    This approach finds some support in psychological principles: "Individuals who had Mild Mental Retardation earlier in their lives manifested by failure in academic learning may, (continued...)

Second, Maldonado challenges the state court's approach in identifying adaptive strengths to discount testimony about what Maldonado could not or cannot do. Maldonado wants the *Atkins* inquiry to focus on deficits, to the complete exclusion of strengths.[54] The Fifth Circuit, however, has employed a broader, more holistic view of an individual's abilities than that suggested by Maldonado. Specifically, the Fifth Circuit has found that "evidence of a strength in a particular area of adaptive functioning necessarily shows that the defendant does not have a weakness in that particular area." *Clark*, 457 F. 3d at 447; *see also Williams*, 293 F.App'x at 313-14 ("[C]ourts are not barred from considering adaptive strengths in evaluating mental retardation claims."). In specific, the Fifth Circuit in *Clark* found no deficiency in adaptive behavior when compared against his successful adaptation and good communication skills. Also, the Fifth Circuit in *Webster v. United States*, 421 F.3d 308, 313 n.15 (5th Cir. 2005), relied on evidence of positive adaptive skills to counter testimony about adaptive deficits. This Court must look at Maldonado's ability to adapt to the world about him both before and after his eighteenth birthday.

In Maldonado's case, testimony showed both adaptive deficits and positive

---

[53]     (...continued)
with appropriate training and opportunities, develop good adaptive skills in other domains and may no longer have the level of impairment required for a diagnosis of Mental Retardation."  DSM-IV-TR at 47.

[54]     Dr. Puente explained why psychologists focus only on deficits: "This is diagnostic work, not rehabilitative work, so the primary focus is what they can't do."  S.H.R. Vol. 2 at 75.

adaptive behaviors.  In the state hearing, Maldonado called as witnesses friends and family members who knew him during his youth in Mexico and his adulthood before the murder to testify about impairments in his ability to function normally in society. Dilea Garcia as the first lay witness.  Ms. Garcia, a neighbor and teacher of Maldonado in his home village of Acuyo, Mexico, testified that Maldonado was born to a prostitute who drank heavily during the pregnancy and did not "provide the attention that he should have had" during his childhood.  Maldonado as a child was "slow to learn," more so than other students.  She explained that "[a]t times he was very attentive and at times he would fall asleep.  He would ask for help from the other students because maybe he could not understand."  She tried to keep Maldonado in school, "but it was not possible."  S.H.R. Vol. 2 at 159.

Next, Patricia Gonzales Garcia, a childhood playmate of Maldonado, testified that Maldonado was never a good student.  She tried to help him with his homework, but "he did not understand much."  She testified that he was malnourished, ill, and had seizures.  S.H.R. Vol. 3 art 7-10.

Maldonado's father testified that his wife drank heavily during her pregnancy. He left her, though, during the sixth month of her pregnancy.  Mr. Maldonado only saw his son once, in his infancy, until Maldonado came to the United States at age 21. Mr. Maldonado helped his son get employment at the car dealership where he worked. Maldonado worked washing and waxing cars.  Mr. Maldonado "had to check the work

was well done." S.H.R. Vol. 3 at 14-18.  Maldonado had to take a driver's licence exam several times before he passed.  S.H.R. Vol. 3 at 33.

Maldonado's cousin Jose Lino Amaro testified that he hired Maldonado to work at his taqueria.  Maldonado worked there for three or four months, though he did not always perform well.  Mr. Amaro allowed Maldonado to "be at the cashier and also that he be in charge but he was . . . limited."  Mr. Amaro testified that "it was [never] very easy for him to have the skill."  He never was given the title "manager." Maldonado would sometimes be absent from work without permission or an excuse. When Mr. Amaro told Maldonado that his performance would have to improve or he would be fired, Maldonado stopped coming to work.  S.H.R. Vol. 3 at 34-37, 41.

On this testimony, and taking into account Maldonado's own account of his life which echoed that given by the lay witnesses, Dr. Puente found adaptive deficits.  Dr. Puente's analysis largely focused on deficits that existed before age 18, though he also mentioned deficits in adulthood.  Dr. Puente identified the following categorical deficits:

> One of them happens to be functional academics.  Functionally, how high did he get academically?  . . .  So is he functionally academically? The answer is marginally so.  . . . He's told me, you know, before when I saw him, that he really enjoyed learning, even though he wasn't very good at it.  . . .
>
> . . . the issue of banking.  I think he had one bank account as an adult after the age of 18, a savings account, which he didn't establish and he didn't know to take money in or out.

I think his use of public transportation was very limited before the age 18. I think he was able to go places, and from what I can gather from my talking to him, the way he was able to go one place to another, for example, Mexico to the United States, was tag along with group, never making his own decisions as to which way to go.

[L]eisure. At the risk of sounding preposterous, smoking pot and doing cocaine is leisure. That is about the most sophisticated – I don't know if we ever talked about him enjoying . . . soccer. He doesn't talk about listening to music or watching movies. Leisure was not part of his life. Existing was.

Social relationships prior to the age of 18. Mother was a prostitute. His best relationship was with his stepfather for a very short period of time. He met his father for the first time at the age of 20. He did have some relationships after the age of 18 with females – he fathered a child – but they were also similarly unsuccessful. But there were at least some relationships later in life, but were marginal, if nonexistent, prior to age of 18.

S.H.R. Vol. 2 at 92-94.

The prosecution's cross-examination of Maldonado's lay witnesses, however, drew out a fuller picture of his life than that used by Dr. Puente to find deficits. Mr. Maldonado testified that his son's early introduction to work in the fields in Mexico, often from dusk to dawn, was not uncommon for people living in that area regardless of intelligence. S.H.R. Vol. 3 at 19-20. Mr. Maldonado explained how his son brought his wife and child to the United States. Maldonado called his father from the border to tell him they were coming, and then crossed the border with a "coyote." S.H.R. Vol. 3 at 25-26. He worked at the car dealership for two to three years, much

longer than other employees.   S.H.R. Vol. 3 at 27-28.   Maldonado secured an apartment for his family.  Mr. Maldonado testified that his son held down two jobs in Houston simultaneously.  S.H.R. Vol. 3 at 18.  For a period, Mr. Maldonado did not have contact with his son, during which time Maldonado engaged in criminal activities.   After serving a federal prison sentence for smuggling marijuana, Maldonado took his family to Chicago for work.  After he returned to Houston and was arrested for murder, he wrote his father from prison regularly.  S.H.R. Vol. 3 at 31.

Maldonado's cousin testified that Maldonado's primary duty was working at the restaurant as a cashier, a skill that is difficult for those with mental retardation. S.H.R. Vol. 3 at 40.  He "gave him a bit of training" and then "left him on his own." S.H.R. Vol. 3 at 40.  Though Maldonado's work ethics were not exceptional, his cousin trusted him in a way that belies mental retardation.

The State also called prison guards and prison officials who testified about Maldonado's sojourn on death row.   Although some testimony showed that Maldonado only spoke in Spanish, other prison officials testified that he spoke in "somewhat broken but . . . very much understandable" English at times.  S.H.R. Vol. 5 at 64-65.  Maldonado keeps his cell "very clean" and "very organized.  Everything has a place and is in its place."  S.H.R. Vol. 5 at 65-66.  While some testimony depicted Maldonado as functionally illiterate, that contrasts sharply with his abilities

to read and write while incarcerated.  The State introduced into evidence reports and records, including properly filled-out commissary requests, prepared by Maldonado. One prison official testified that Maldonado "did a pretty good job keeping up with maintaining and adding [his spending and purchases] up."  S.H.R. Vol. 5 at 35-36. Also, Maldonado correctly and intelligibly filled out prison grievance and medical forms.  The State introduced into evidence many letters Maldonado had written while incarcerated, presumably to show that he was literate and to show that he is not mentally retarded.[55]  The letters are lengthy, written in Spanish, and include numerous references to the Bible.  The State translated a few letters that, while by no means amount to literary masterpieces, do not facially give an impression of substantial intellectual impairments.[56]  Maldonado did not allege that anyone had transcribed the written material for him.

### AEDPA Review of State Findings on Adaptive Behavior

Taken as a whole, Maldonado's life, particularly after age 18, shows both strengths and weaknesses in his ability to adapt to the world around him.  Without question, Maldonado experienced some difficulty in adaptation, most especially in his

---

[55]   Maldonado objected to the letters and other exhibits the State intended to offer, mainly arguing that they were confidential communications.  S.H. at 2358.

[56]   Maldonado's experts, and particularly Dr. Puente and Dr. Weinstein who speak Spanish, did not review the prison correspondence.  Maldonado does not instruct the Court on how to evaluate the written material in a way that would support a finding of mental retardation.

early life.  Maldonado came from a tragic childhood and suffered horrendous neglect.
The lack of opportunity halted his education, his future possibilities, and his social
interactions.  This, however, is not indicative of his intellectual potential or cognitive
capacity.  Testimony about what Maldonado could not do came largely from
individuals who reached nearly three decades back to his childhood in Mexico.
Notwithstanding his disadvantaged and inhibiting background, Maldonado sought
better life opportunities.  He worked and provided for his family as an adult.
Maldonado exhibited initiative in criminal pursuits, replacing adaptive work skills
with drug running, bank robbery, and armed assaults.  The transcript of Maldonado's
police questioning and his testimony in a suppression hearing do not give any obvious
suggestion of mental impairment.  As noted by the state court, Maldonado failed

> to show deficits in adaptive behavior based, in part, on [his] history of
> driving, procuring and transporting drugs, sometimes working in
> legitimate jobs, attempting to escape detection during his criminal
> offenses, his interactions with others at Polunsky Unit, his
> correspondence with others, his maintaining his commissary account at
> Polunsky Unit, and his use of the grievance system at Polunsky Unit.

S.H.R. at 2523.

The record shows strengths that more than coexist with weaknesses; they call
into question the depth of those reported weaknesses.  Taking the reported behaviors
and circumstances that would support the finding of adaptive deficits in the context
of a broader view of his life, abilities, and current skill level, this Court cannot hold

that the state habeas court was unreasonable in finding that Maldonado "fails to show deficits in adaptive behavior." S.H.R. at 2523. Maldonado has shown some difficulty in functioning, but has not shown that the difficulties significant in a way anticipated by *Atkins*, particularly because of what Maldonado is able to do. In light of the evidence presented, this Court finds that the state courts were not unreasonable in finding a lack of adaptive deficits to a degree that would meet *Atkins*' second prong.

### 3.    Onset Before Age 18

Because Maldonado has not shown either diminished cognitive capacity nor significant adaptive deficits, he has not shown that they originate in his youth.

### D.    Conclusion of Maldonado's Mental Retardation Claims

The state habeas court provided Maldonado a full and fair opportunity to prove his mental retardation. The testimony in state habeas court developed a highly sympathetic portrait of how abuse, severe neglect, and grinding poverty limited Maldonado's intellectual development in his childhood. As the Court will discuss below, the jury did not receive a fully detailed portrait of the tragedies in young Maldonado's life. However mitigating the information about Maldonado's childhood may be, the compassionate effect of the evidence alone does not prove that Maldonado is mentally retarded. Abuse, neglect, and educational deficiencies may coexist with and contribute to, but simply are not synonymous with, mental retardation. The state

court testimony established that Maldonado is not highly intelligent, but the evidence significantly differed on the depth of his mental deficiencies.  The conflicted nature of his mental abilities unfortunately suggests that none of the experts was fully able to discern Maldonado's true level of intellectual functioning.  The State has argued that Maldonado's showing of his cognitive abilities has been compromised by its limited scope; Maldonado has argued that the State's expert held biases and opinions which tainted his view.  Neither side provides confidence that it has captured a full picture of Maldonado's mental abilities.

The net effect of the hotly disputed psychological evidence in this case confirms that psychological experts can view identical sets of information differently, making the *Atkins* inquiry less scientific and more subjective.  In any event, Maldonado has not shown that the state habeas court was unreasonable in finding that his general intellectual functioning was not significantly subaverage and that he did not have a pervading inability to adapt to the world around him.  Accordingly, the Court cannot conclude that the state habeas court was unreasonable in finding that Maldonado was not mentally retarded as understood by *Atkins*.  *See* 28 U.S.C. § 2254(d).  The Court denies Maldonado's *Atkins* claim.

## II.   <u>Vienna Convention Claim</u>

Maldonado – a native and citizen of Mexico – claims that he merits habeas relief because the State of Texas did not give notice of his rights under the Vienna

Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, [1970] 21 U.S.T. 77.  The Vienna Convention "provides that if a person detained by a foreign country so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State of such detention, and inform the detainee of his right to request assistance from the consul of his own state." *Medellín v. Texas*, __ U.S. __, 128 S. Ct. 1346, 1353 (2008) (internal quotation omitted); *see also* Vienna Convention, Art. 36(1)(b).  "In other words, when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 338-39 (2006).  Maldonado asks this Court to vacate his capital conviction and death sentence because Texas did not strictly comply with the requirements of the Vienna Convention.

Recent years have seen much interest in the interplay between Vienna Convention rights, international law, the American criminal justice system, and the principles of federalism that define the rule of dual sovereigns in this Nation. International law has emphasized the importance of strict compliance with the Vienna Convention.  The United States ratified the Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 24, 1963, 21 U.S.T. 325 ("Optional Protocol"), that placed the resolution of Vienna Convention disputes within the

compulsory jurisdiction of the International Court of Justice ("ICJ").[57]  In 2004, the ICJ issued a decision ordering the United States to review and reconsider the conviction of 51 Mexican nationals on death row (including Maldonado) who may not have received the full protection of the Vienna Convention.  *See* Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.), 2004 I.C.J. 12 (Judgment of Mar. 31) ("*Avena*").  Maldonado asks this Court to give effect to *Avena* by granting habeas relief on his Vienna Convention claim.

The federal government has acted to enforce the *Avena* decision.  In February 2005, former President George W. Bush issued a Memorandum to the United States Attorney General directing the States to comply with the *Avena* decision ("presidential declaration").  The State of Texas, however, objected that the presidential declaration upset the balance of federalism that undergirds federal/state relations.  Eventually, the Court of Criminal Appeals dismissed successive habeas actions raising Vienna Convention claims as an abuse of the writ by finding that neither the *Avena* judgment nor the President's memorandum supplanted state procedural law.  *See Ex parte Medellín*, 223 S.W.3d 315, 322-23 (Tex. Crim. App. 2006).

In *Medellín*, the United States Supreme Court affirmed Texas' reliance on

---

[57]    "The United States has since given notice of its withdrawal from the Optional Protocol in which it agreed to be bound by the ICJ decision." *Leal Garcia v. Quarterman*, 573 F.3d 214, 217 n.14 (5th Cir. 2009); *see also Sanchez-Llamas*, 548 U.S. at 339; *Gomez v. Quarterman*, 529 F.3d 322, 327 n.2 (5th Cir. 2008).

federalism, holding that: (1) the ICJ judgment in *Avena* did not constitute "binding federal law" that would preempt state procedural law, such as Texas' abuse-of-the-writ limitations; and (2) the President lacked authority to make the *Avena* judgment binding on the state courts.  The Supreme Court rendered the *Medellín* decision against a backdrop of other cases in which it held that international obligations under the Vienna Convention did not supplant the independence of the States.  *See Sanchez-Llamas*, 548 U.S. at 351-52; *Breard v. Greene*, 523 U.S. 371, 375-76 (1998).[58]  In short, the Supreme Court has not subjugated state law to international treaties in the Vienna Convention context.

The same concerns for the enforcement of federal treaties, the integrity of state procedural law, and the boundaries of federalism are present in this case.  There is no dispute that the State of Texas did not inform Maldonado of his Vienna Convention

---

[58]   For example, in *Breard v. Greene*, 523 U.S. 371 (1998), the Supreme Court considered the effect of the procedural default doctrine on a prisoner's Vienna Convention claim. Recognizing that federal courts "should give respectful consideration to the interpretation of an international treaty rendered by an international court," the Supreme Court nonetheless found that, "absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State." *Id.* at 375.  The Supreme Court noted that "[t]his proposition is embodied in the Vienna Convention itself, which provides that the rights expressed in the Convention 'shall be exercised in conformity with the laws and regulations of the receiving State,' provided that 'said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.'" *Id.* at 375 (quoting Vienna Convention, Article 36(2)).  The Supreme Court held that the procedural default doctrine could bar consideration of a Vienna Convention claim.  *See id.* at 375-76.  The Supreme Court supported this finding by recognizing that the procedural default doctrine applied even to claims brought under the United States Constitution – a document "'on full parity with a treaty.'" *Id.* at 376 (quoting *Reid v. Covert*, 354 U.S. 1, 8 (1957)).

rights (though, as will be discussed later, the Mexican Consulate became aware of his

arrest before trial).  When Maldonado first raised a Vienna Convention claim in his

initial round of habeas review, as a remedy he asked the state courts to suppress his

custodial statement and vacate his conviction.[59]  The state habeas court first found

that, because trial counsel raised no international law objection when Maldonado's

statement was introduced into evidence, Texas' contemporaneous objection rule

---

[59]    Maldonado did raise a similar claim on direct appeal.  There, he argued that the trial court
erred by not giving jurors the option of rejecting his confession if he did not receive notice
of his Vienna Convention rights.  Maldonado argued that a violation of the Vienna
Convention fell under Texas' guarantee that "[n]o evidence obtained by an officer or other
person in violation of any provisions of the Constitution or laws of the State of Texas, or of
the Constitution or laws of the United States of America, shall be admitted in evidence
against the accused on the trial of any criminal case."  TEX. CODE CRIM. PRO. art. 38.23.
The Court of Criminal Appeals conceded that "a violation of this treaty would arguably fall
under the language in Article 38.23(a) if the issue is raised by the evidence."  *Maldonado*,
998 S.W.2d at 247.  Yet the Court of Criminal Appeals rejected this claim because the record
did not establish that Maldonado was a Mexican citizen:

> Only if [Maldonado] is a foreign national did authorities have an obligation
> to notify him of his right to consular access. Testimony at trial showed that
> [Maldonado] lived in Mexico when he was a child and that is where he knew
> the victim's son, Augustin Saucedo. This evidence does not preclude the
> possibility that [Maldonado] became a United States citizen after coming to
> this country.  Other evidence showed [Maldonado] had lived in the United
> States for many years, spoke some English, had a Texas driver's license, and
> had purchased a car in the United States.  No one testified that [Maldonado]
> was not a United States citizen. In sum, trial evidence did not show appellant
> was a Mexican citizen.

*Maldonado*, 998 S.W.2d at 247.  While the resolution of Maldonado's appellate claim is
somewhat related to the issue raised in federal court, Maldonado's federal claim argues that
the Vienna Convention is actionable as a legal principle itself, rather than relying on state
law as a vehicle to put information about the Vienna Convention before a jury.

procedurally barred consideration of its merits.[60]  In addition to that procedural ruling, the state habeas court alternatively listed other reasons for denying relief: the Court of Criminal Appeals had already found that Maldonado voluntarily confessed to the murder; he lacked standing to contest the violation of international treaties; he had not demonstrated that the State violated his constitutional rights by not complying with the treaty; he had not shown that suppression was the appropriate remedy when the police take a foreign national's statement without informing him of Vienna Convention rights; and he had not proven that any violation of the treaty harmed him.

Maldonado tried to raise a Vienna Convention claim again in a successive habeas application, this time connecting the alleged international law violation to the inadequate presentation of evidence in the punishment phase.  The Court of Criminal Appeals issued a terse order finding that Maldonado's pleading violated Texas' abuse-of-the-writ doctrine, codified in TEX. CODE CRIM. PRO. art. 11.071 § 5.  In sum, state procedural law barred consideration of Maldonado's Vienna Convention claims each time he raised the argument in habeas.  The Texas courts alternatively denied Maldonado's Vienna Convention arguments relating to the guilt/innocence phase on

---

[60]     The parties mentioned the Vienna Convention briefly at trial.  Trial counsel asked Officer Escalante whether he informed Maldonado of his Vienna Convention rights.  Tr. Vol. 24 at 81-82.  Trial counsel also unsuccessfully requested a jury instruction that would allow the jury to ignore his confession if the State had not informed him of the Vienna Convention. Trial counsel, however, did not raise the same arguments at trial that Maldonado did on habeas review.

the merits and found that he had not shown harm. Maldonado challenges these rulings in his federal habeas petition.

### A.    Procedural Bar

Texas applied its procedural law – the abuse-of-the-writ doctrine and contemporaneous-objection rule – and dismissed the Vienna Convention claim that Maldonado advances on federal review. The Supreme Court has specifically held that Vienna Convention claims, despite their basis in international treaties, are subject to state procedural rules. *See Sanchez-Llamas*, 548 U.S. at 351-52; *Breard v. Greene*, 523 U.S. 371, 375-76 (1998); *see also Chi v. Quarterman*, 223 F.App'x 435, 438-39 (5th Cir. 2007); *Cardenas v. Dretke*, 405 F.3d 244, 252-53 (5th Cir. 2005). The Fifth Circuit has consistently held that each of these procedural rules is an adequate and independent barrier to federal review. The Supreme Court has long held that such procedural rules bar federal consideration of defaulted claims, except under narrow exceptions. While Maldonado disputes the state procedural rulings, he has not shown clear error in Texas' invocation of its procedural law. Maldonado's Vienna Convention claim is not before the Court in a procedurally adequate posture.

### B.    Individually Enforceable Rights Under the Vienna Convention

Maldonado's Vienna Convention claim lacks merit even assuming he adequately presented it to the state courts. The federal writ of habeas corpus is only available when a petitioner shows that the state court judgment was "contrary to, or

involved an unreasonable application of, *clearly established Federal law, as determined by the Supreme Court of the United States*[.]" 28 U.S.C. § 2254(d)(1) (emphasis added). Maldonado premises his Vienna Convention claim on the assumption that criminal defendants can enforce that international treaty in the domestic courts. Maldonado correctly argues that "the right to consular assistance is not just a meaningless procedural or technical formality; it is a substantive right designed to inform foreign nationals of legal rights that they might not otherwise comprehend and thereby protect their fundamental right to due process of law." (Doc. # 11 at 54). The pertinent question, however, is whether clearly established federal law requires that domestic courts be the forum for protecting those rights.

"The Vienna Convention binds the United States as a matter of international law, but does not bind the individual states of the Union unless and until Congress passes enabling legislation enacting its provisions." *Leal Garcia v. Quarterman*, 573 F.3d 214, 218 n.19 (5th Cir. 2009); *see also Sanchez-Llamas*, 548 U.S. at 346-47. As it now stands, Vienna Convention violations are "enforceable by one member-nation against another, which is why Mexico took the *Avena* suit to the ICJ." *Leal Garcia*, 573 F.3d at 218 n.19. The Supreme Court to date has found "it unnecessary to resolve the question whether the Vienna Convention grants individuals enforceable rights." *Sanchez-Llamas*, 548 U.S. at 343; *see also Medellin*, ___ U.S. at ___, 128 S. Ct. at 1357 n.4 (finding it "unnecessary to resolve whether the Vienna Convention is itself

'self-executing' or whether it grants [a defendant's] individually enforceable rights");

*Breard*, 523 U.S. at 376 (stating that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest" but leaving the resolution of that issue to the lower courts). Maldonado concedes that the Supreme Court has "left open the question of whether domestic remedies could be provided for violations of the Vienna Convention or for constitutional claims related to the Vienna Convention." (Doc. # 11 at 45). No Supreme Court precedent provides for relief on Maldonado's Vienna Convention claim.

In the absence of contrary Supreme Court authority, Fifth Circuit precedent binds this Court's analysis. Because the preamble to the Vienna Convention explains that it is "not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States," the Fifth Circuit has "held that Article 36 of the Vienna Convention does not create an individually enforceable right." *Medellin v. Dretke*, 371 F.3d 270, 280 (5th Cir. 2004); *see also United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2001) ("The sum of Jimenez-Nava's arguments fails to lead to an ineluctable conclusion that Article 36 creates judicially enforceable rights of consultation between a detained foreign national and his consular office. Thus, the presumption against such rights ought to be conclusive.").

Because the Supreme Court has not yet realized an individually enforceable

right under the Vienna Convention, this Court could only recognize such right by creating new constitutional law. The nonretroactivity principle in *Teague v. Lane*, 489 U.S. 288 (1989), denies habeas courts the ability to create new law. *See Breard*, 523 U.S. at 377 (suggesting that a Vienna Convention claim would fall under *Teague*'s non-retroactivity principle); *Plata v. Dretke*, 111 F. App'x 213, 216 (5th Cir. 2004) (finding that the petitioner "ha[d] not shown that the district court's denial of his [Vienna Convention] claim as *Teague*-barred is debatable"); *Flores v. Johnson*, 210 F.3d 456, 457-58 (5th Cir. 2000) (citing *Breard* to *Teague*-bar a Vienna Convention claim). Maldonado has not shown under existing law that the Vienna Convention creates a right which can form the basis for habeas relief.[61]

### C.    Actual Harm and Remedy

Even if procedural law and non-retroactivity principles did not mandate the denial of this claim, and the Court were to assume that the Vienna Convention created an enforceable individual right, Maldonado would still have to prove concrete, non-speculative harm. *See Breard*, 523 U.S. at 377; *Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir. 1996). Maldonado argues that international law, as interpreted by the ICJ,

---

[61]    Maldonado asserts that, "[i]n light of the Supreme Court's pronouncement in *Medellin* . . ., the executive and legislative branches of the federal government have been working diligently to fulfill the international law obligation of the United States." (Doc. # 11 at 84). The Fifth Circuit has held that habeas relief on a Vienna Convention claim cannot rest on speculation about future political developments. *See In re Fierro*, 281 F.App'x 264, 265-66 (5th Cir. 2008).

does not require a showing of prejudice for Vienna Convention violations. *See F.R.G.*
*v. United States*, 2001 ICJ 466 (June 27).   The Supreme Court, however, has
suggested that an inmate would need to show more than speculative harm flowing
from any Vienna Convention violation, specifically when "provided with effective
legal representation[.]"   *Medellin v. Dretke*, 544 U.S. 660, 665 (2005).   When a
Vienna Convention claim is "properly raised and proven, it is extremely doubtful that
the violation should result in the overturning of a final judgment of conviction without
some showing that the violation had an effect on the trial."  *Breard*, 523 U.S. at 377.

Maldonado contends that the Mexican Consulate would have taken immediate
steps to assist his case, most notably in the ability "to fully and effectively investigate
Maldonado's family history and psychological condition, both of which were
necessary in order to provide Maldonado with a proper defense." (Doc. # 11 at 78).
Maldonado has presented what purports to be an affidavit[62] in which Mr. Manuel
Perez Cardenas, a former Houston representative of the Mexican Consulate, states:

> I first learned that Mr. Maldonado was a Mexican national facing a
> capital murder trial in August 1997, almost a year and a half after his
> initial detention in April 1996.  This information came to me as a result
> of the media.  If we had known that Mr. Maldonado was a Mexican

---

[62]   The "Affidavit of Manuel Perez Cardenas" is signed, but not dated or notarized.  Maldonado,
however, also submits an affidavit from the person who replaced Mr. Perez Cardenas as
Consul General of Mexico in Houston.  She attests that she recognizes the signature of the
previously mentioned document as that of Mr. Perez Cardenas.  (Doc. # 11, Exhibit D).

> national at the time of his initial detention, consular officials would have
> offered flexible and far-reaching assistance to avoid the imposition of the
> death penalty. Our consular assistance spans a wide variety of services,
> and we would have made all of them available to Mr. Maldonado.

(Doc. # 11, Exhibit D). Mr. Perez Cardenas lists many services that the Mexican
government allegedly would have provided Maldonado had it received notice of his
citizenship, including furnishing supplemental funds, assisting in the collection of
mitigating evidence, and otherwise guaranteeing Maldonado an adequate defense.

However well-intentioned these assurances of help, the Court cannot take them
at face value. Maldonado argues that "it is the custom and practice of the Mexican
Consulate to actively intervene as soon as it is notified of a Mexican national's
detention and/or arrest." (Doc. # 11 at 59). The Mexican consulate knew about
Maldonado's citizenship a month before trial. Despite the fast-approaching trial,
consular officials did not move to secure different legal representation, ask for a
continuance, volunteer investigative assistance, or in any way provide resources to
Maldonado. It is not reasonable to assume that the Mexican government, which sat
on the sidelines while one of its citizens was tried for capital murder, would have
acted differently had it been informed earlier.

Otherwise, Maldonado asks this Court to assume that informing him of his
Vienna Convention rights would have resulted in different trial representation by
attorneys who would not have committed the errors he imputes to trial counsel. Such

a showing of harm is speculative.

Even if Maldonado had shown a violation of international law, the Vienna Convention itself does not articulate a specific remedy for its violation. *See Jimenez-Nava*, 243 F.3d at 199.[63]   While Maldonado asks this Court to void his conviction and sentence because of a Vienna Convention violation, no Supreme Court or Fifth Circuit precedent requires that result.   Even if issuance of the federal habeas writ is an appropriate remedy for a procedurally adequate Vienna Convention claim showing actual harm, that is not the case before the Court.   Procedural law bars full federal consideration of Maldonado's Vienna Convention claim, no federal precedent provides for relief, and the circumstances of this case do not persuasively show that the violation harmed his defense.   The Court denies this claim.

## III.   Maldonado's Right to Counsel under the Fifth and Sixth Amendments

Maldonado claims that the police violated his constitutional rights when interrogating him about the murder of Cruz Saucedo.   Maldonado alleges that he invoked the right to counsel before the police took his statement in which he confessed to the murder.   Alternatively, Maldonado argues that, even if he waived his rights, his mental retardation prevented him from making a knowing or intelligent decision.   The Court will review the circumstances leading to his confession before

---

[63]   The Supreme Court in *Sanchez-Llamas* found that suppression of a confession or otherwise-valid custodial statement was not a proper remedy. *See Sanchez-Llamas*, 548 U.S. at 343-44.

turning to the procedural and substantive merit of his arguments.

## A.    Background

Maldonado filed a pre-trial motion to suppress his confession arguing that he did not freely and voluntarily confess and that the warnings he received did not inform him of his right to remain silent.  Also, Maldonado complained that the audiotaped recording of his statement did not show that he waived his constitutional rights. Trans. at 51-52.  Maldonado filed two subsequent motions seeking to suppress the audio recording of his statement.  Trans. at 112-18.  Maldonado argued that someone could have tampered with the tape recording because in two places "over-recording" omitted portions of the conversation.[64]

The trial court held a hearing to develop Maldonado's objection that the police took his statement in violation of his Fifth Amendment rights.  The Court will summarize the factual basis for Maldonado's challenge to the admission of his confession using testimony given in that hearing and at trial.

On April 11, 1996 – exactly five months after Maldonado murdered Cruz Saucedo – officers from the Houston Police Department arrested Maldonado for an unrelated bank robbery.  Officer Jaime Escalante met with Maldonado in a police

---

[64]    Maldonado based his challenge on TEX. CODE CRIM. PRO. art. 38.22(3)(a)(3) which requires, before a recorded statement becomes admissible, that "the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered[.]"

interview room and advised Maldonado of his *Miranda* rights in Spanish. Maldonado did not ask for an attorney. According to Officer Escalante, Maldonado "said he spoke some English, but he wanted to conduct the interview in Spanish." Tr. Vol. 18 at 10. Officer Escalante interviewed Maldonado in Spanish.

A Texas state district court appointed Maldonado a lawyer, Dominique Gerard, on April 15, 1996, for the bank robbery charge. Tr. Vol. 19 at 37-38. Mr. Gerard testified that he told Maldonado not to speak with the police: "I advised him not to talk to anybody, no matter what was promised, until he talked to me." Tr. Vol. 19 at 38. Maldonado and Mr. Gerard did not communicate again until May 2, 1996. Then, Mr. Gerard again told Maldonado not to speak with the police outside the presence of counsel. Tr. Vol. 19 at 34. Mr. Gerard testified that he also spoke with Lieutenant Murray Smith of the H.P.D. homicide unit:

> I told him that my client had called me and he was being pulled out of his jail cell to talk to police officers, and that I had advised him not to talk to anybody. And I told Lieutenant Smith that I expected him to honor that agreement and not have anybody else interview my client.

Tr. Vol. 19 at 34. Mr. Gerard also spoke with prosecutor Joe Omby: "I talked to him . . . and advised him that I did not want to have anybody talk to my client unless I was there. And he told me that he would advise the police not to talk to him again." Tr. Vol. 19 at 35. By that point, it was too late. Maldonado had already confessed to the murder of Cruz Saucedo.

After his arrest for bank robbery, the police "learned that [Maldonado had been] involved in . . . homicides." Tr. Vol. 18 at 12.  On April 24, 1996, Officer Escalante met Maldonado to interview him "regarding the homicides.  To see if he wanted to talk to [the police] regarding the homicides." Tr. Vol. 18 at 13.  When first asked if he knew beforehand that Maldonado had an attorney for the bank robbery case, Officer Escalante testified: "I have no idea.  I think he did, but I'm not sure." Tr. Vol. 18 at 13.  Officer Escalante later clarified that Maldonado said "I got a lawyer, I don't know who it is." Tr. Vol. 18 at 36-37.  In any event, Officer Escalante made no effort to contact Mr. Gerard. Tr. Vol. 18 at 36.

Officer Escalante started the April 24 interview by reading Maldonado his rights in Spanish.  During that interview, Officer Escalante did not speak with Maldonado about the bank robbery; they only discussed the Saucedo murder. Tr. Vol. 18 at 15.  Maldonado told Officer Escalante that he "wanted time to think about it and for [Officer Escalante] to come the following day." Tr. Vol. 18 at 17.  Maldonado said that the next day "he'd decide if he was going to talk to [the police] or not." Tr. Vol. 18 at 17.  Officer Escalante ended the interview.  Officer Escalante testified that he thought Maldonado would probably contact his attorney after he left. Tr. Vol. 18 at 38.

On April 25, 1996, Officer Escalante returned and again read Maldonado his rights.  Maldonado told Officer Escalante that he "definitely" understood his rights.

Tr. Vol. 18 at 22.  Maldonado did not ask to speak with an attorney.  Tr. Vol. 18 at 22.

A translated transcription of the interview shows that Officer Escalante read

Maldonado his rights and that Maldonado affirmed that he understood them.  Officer

Escalante testified that he did not promise Maldonado anything, unduly influence him,

or guarantee to secure leniency for Maldonado.  Tr. Vol. 18 at 85.  Maldonado gave

Officer Escalante a lengthy audiotaped statement describing his role in the murder.

In his suppression hearing testimony, Maldonado gave a different account of

his interaction with Officer Escalante.  When asked if Officer Escalante read him his

rights, Maldonado testified: "He just told me some things very quickly, but I didn't

even understand what he was telling me. . . . I understood the words that he was telling

me, but I didn't understand the consequences of what he was – what was going to

come of it."  Tr. Vol. 18 at 65-66.  Maldonado testified:

> [W]hen he arrived, he told me that he had just come back from the
> hospital and he had visited [co-perpetrator] Benito Chanocua.  And he
> said that Benito Chanocua had told him that he was accusing me of a lot
> of things and that he was talking and talking.
>
> He told me not to be stupid, because if not, he was going to take me
> down.  And he told me that if I would talk, that he was going to talk to
> the prosecutor so that they could help me out some way.

Tr. Vol. 18 at 64.  Maldonado testified that Officer Escalante kept telling him "not to

be dumb, that he could take [him] down, and that he could help [Maldonado] out."

Tr. Vol. 18 at 66.

After taking testimony, the trial court allowed the parties to present oral argument related to the suppression motions.  Maldonado's argument accused the prosecution of inducing Maldonado to confess through false promises.  Also, Maldonado complained that the tape recording was unreliable and thus inadmissible. Maldonado's trial attorney, however, did not argue that he had invoked his right to counsel or that the appointment of an attorney for the bank robbery charge precluded his interrogation for the capital murder.  The trial court denied Maldonado's motion to suppress.  At trial, the State introduced the tape recording of Officer Escalante's interview and a transcript of the statement, including an English translation, into evidence.  Tr. Vol. 30, State's Exhibits 1 and 2.

Maldonado's federal petition raises three claims relating to the admissibility of his confession.  Maldonado  alleges that he invoked his right to counsel on April 24, thus making Officer Escalante's reinitiating of the interview on April 25 a violation of his Fifth Amendment rights.  Maldonado also asserts that, even if he did not invoke his right to counsel prior to the April 25 statement, mental retardation precluded a knowing or intelligent waiver of his rights.  Maldonado also argues that the repeated interrogations without counsel violated his Sixth Amendment rights.  Respondent claims that Maldonado's arguments are both procedurally barred and without merit.

## B.     Procedural Bar

Before turning to Maldonado's constitutional challenge, the Court must

112

determine whether he has presented his claims in a procedurally adequate manner. Maldonado unsuccessfully challenged the admissibility of his in-custody statements repeatedly throughout his post-trial proceedings.  On direct appeal, Maldonado alleged that flaws in the audio recording and the transcription of the statement rendered his statement inadmissible.  He also alleged that Officer Escalante coerced him into confessing by promising him leniency with prosecutors if he gave a statement.  The Court of Criminal Appeals rejected both arguments.[65]

In his first state habeas action, Maldonado claimed that the police violated his Sixth Amendment right to counsel, even if he made a valid waiver of his Fifth Amendment rights, by interviewing him outside the presence of the attorney who had been appointed in his bank robbery case.  The state habeas court found that "[b]y

---

[65]   The Court of Criminal Appeals ruled:

> In the instant case, at the suppression hearing, [Maldonado] claimed Escalante repeatedly offered to speak to the prosecutor on his behalf:
>
> > And he told me not to be stupid, because if not, he was going to take me down. And he told me that if I would talk, that he was going to talk to the prosecutor so that they could help me out some way.
>
> However, Escalante vehemently denied making promises or otherwise using coercion to convince [Maldonado] to confess. When faced with [Maldonado's] claims, he asserted: "I would never make a promise like that." Thus, the determination of the factual basis of [Maldonado's] claim turned on an evaluation of the credibility and demeanor of these two primary witnesses.  In such a situation, we have recognized the trial court's superior position.  In this case, we cannot say the court abused its discretion.

*Maldonado,* 998 S.W.2d at 247-48 (citation omitted).

failing to object on the ground that [Maldonado's] April 25, 1996, statement was taken in violation of his Sixth Amendment right to counsel when his statement was admitted, [Maldonado] has waived habeas review[.]"  State Habeas Record at 153. In the alternative, the state court found that his "confession was not taken in violation of the Sixth Amendment because the right to counsel under the Sixth Amendment is offense-specific and had not attached to the instant offense."  State Habeas Record at 153 (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175-76 (1991)).

In his second habeas action, Maldonado tried to raise several clams, including: (1) mental retardation precluded his execution under *Atkins*; (2) the admission of Maldonado's statement violated the Fifth Amendment because he invoked his right to counsel; (3) his mental retardation made him unable to confess knowingly and voluntarily; and (4) Officer Escalante's interrogations outside the presence of counsel violated the Sixth Amendment.[66]  The Court of Criminal Appeals allowed Maldonado to proceed on his *Atkins* claim but found that the remainder of his allegations – including his Fifth and Sixth Amendment challenges to his confession – did not meet the requirements of TEX. CODE CRIM. PRO. art. 11.071 § 5(a).  The order simply stated: "In the instant cause, [Maldonado] presents three allegations.  We have

---

[66]    In his initial federal action, Maldonado conceded "that he did not previously present . . . his claims that Texas violated his Fifth Amendment right to counsel, Sixth Amendment right to effective assistance of counsel, and Fifth and Fourteenth Amendment *Brady* right to exculpatory evidence, respectively."  *Maldonado v. Cockrell*, No. H:03-cv-811 (S.D. Tex.) (Doc. # 22 at 12).

reviewed the application and find the first allegation satisfies the requirements of Art.

11.071, Sec. 5(a), V.A.C.C.P.  The remaining allegations do not satisfy an exception

and are dismissed as an abuse of the writ."  *Ex parte Virgilio R. Maldonado*, No.

51,612-02 (Tex. Crim. App. July 2, 2003).  Respondent contends that this procedural

ruling bars consideration of the Fifth and Sixth Amendment claims that Maldonado

raises in his federal petition.

Texas applied its procedural law to bar consideration of the claims Maldonado

raises on federal review.  While Maldonado raised a similar issue on direct appeal, he

only exhausted his federal claims in his first and second habeas actions.  There, the

state habeas court found that (1) Maldonado forfeited consideration of his Sixth

Amendment claim by not lodging a similar objection at trial; and (2) he abused the

state habeas process by raising his Fifth Amendment and reurging his Sixth

Amendment claims in an inappropriate successive application.  Maldonado challenges

the procedural adequacy of the second ruling.[67]

The Fifth Circuit has routinely and regularly found that TEX. CODE CRIM. PRO.

art. 11.071 § 5(a) – the codification of Texas' abuse-of-the-writ doctrine – serves as

an independent and adequate ground to bar federal review.  *See Barrientes*, 221 F.3d

at 759; *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998); *Emery v. Johnson*, 139

---

[67]     Because Maldonado does not show cause and prejudice, he cannot overcome the procedural
bar of the Sixth Amendment claim that he procedurally defaulted in his initial round of state
habeas review.

F.3d 191, 195-96 (5th Cir. 1997); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).

Maldonado, however, makes two arguments against its application here.  First,

Maldonado argues that Texas' abuse-of-the-writ inquiry is not a mere procedural

finding, but also incorporates a "ruling on whether a meritorious federal claim has

been alleged."  (Doc. # 18 at 37).  Thus, under his reasoning, the procedural

determination is not sufficiently independent of a merits adjudication, which involves

federal law, to foreclose federal review.  Second, Maldonado complains that the

brevity of the state court order makes it unclear whether the Court of Criminal

Appeals rejected his claim on procedural grounds.

Comity and federalism mandate that federal courts give proper respect to state

procedural rules, insofar as the "rule is independent and adequate to support the

judgment."  *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001).  While federal

courts "have an independent duty to scrutinize the application of state rules that bar

our review of federal claims," *Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1782

(2009), "[t]he petitioner bears the burden of showing that the state did not strictly or

regularly follow a procedural bar around the time of his [state court action]."  *Stokes

v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (citing *Sones v. Hargett*, 61 F.3d 410,

416 (5th Cir. 1995)).

The "independent" and "adequate" inquiries examine separate components of

the state procedural ruling.  A state procedural rule is not independent when the

116

relevant decision "'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" *Coleman*, 501 U.S. at 735 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).  A rule qualifies as adequate when it "is strictly or regularly followed by the cognizant state court" and "applied evenhandedly to the vast majority of similar claims." *Amos v. Scott*, 61 F.3d 333, 339 (5th Cir. 1995).

Maldonado's argument relies primarily on *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007), a case in which he alleges that the Court of Criminal Appeals inserted a merits review into its art. 11.071 § 5(a) inquiry.  In *Campell*, the Court of Criminal Appeals addressed the implementation of the statutory standards for successive petitions:

> To satisfy section 5(a)(1), a subsequent application must contain sufficient specific facts establishing that "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application."  We have interpreted this to mean that, to satisfy Art. 11.071, § 5(a), 1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence.

*Campbell*, 226 S.W.3d at 421.  Maldonado latches onto the phrase, "specific facts

alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence," to argue that the Texas courts now universally engage in a merits review when dismissing successive petitions. Maldonado also cites *Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007), a case relying on *Campbell* in which the Fifth Circuit refused to find that a state procedural bar foreclosed federal review.

The circumstances of this case do not suggest that the Court of Criminal Appeals adjudicated the merits of claims from his successive application which attacked his confession.  The state court order differed greatly from that in *Ruiz*.  In *Ruiz*, the state court adjudication was uncertain because of the disjointed and discrete decision rendered by the Court of Criminal Appeals.  The Fifth Circuit laboriously examined the opinions of individual judges on the Court of Criminal Appeals to conclude that the state court applied federal law.  In essence, the determinative vote cast in *Ruiz* explicitly rested on a merits review.

Here, nothing in the record suggests that the Court of Criminal Appeals adjudicated the merits of Maldonado's Fifth and Sixth Amendment claims.  The Court of Criminal Appeals' brief order specifically invoked Texas' abuse-of-the-writ statute. Subsequent Fifth Circuit cases show that *Ruiz* should not be read so broadly as always to prevent art. 11.071 § 5 from acting as an independent and adequate procedural bar.

The Fifth Circuit since *Ruiz* has applied Texas' abuse-of-the-writ doctrine in circumstances similar to this case.  *See Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).  In *Hughes*, the Fifth Circuit identified two factors that discourage reading any uncertainty into the Court of Criminal Appeals' terse order.  First, the factual basis for Maldonado's barred claims were obviously available well before he filed his successive state habeas proceeding.  *See Hughes*, 530 F.3d at 342 ("No application or interpretation of federal law is required to determine whether a claim has, or could have, been presented in a previous habeas application.").  Second, "there is nothing in its perfunctory dismissal of the claims that suggests that [the Court of Criminal Appeals] actually considered or ruled on the merits."  *Id.* at 342.  As in *Hughes*, the state court's order would not depend on resolution of the merits in this case.  *See Stewart v. Smith*, 536 U.S. 856, 861 (2002) (looking at whether the state procedural rule "require[d] an examination of the merits").  A valid state procedural bar foreclosed federal review of Maldonado's Fifth and Sixth Amendment attacks on his confession.

Maldonado does not argue that cause and prejudice exist to overcome the procedural default.  State procedural law bars federal consideration of Maldonado's challenges to his confession.  In an abundance of caution, the Court will briefly address the merits of his arguments.

119

## C.     Alternative Review of the Merits

The Constitution assures the right to counsel through both the Fifth and Sixth Amendments.  Those two amendments, however, protect separate dimensions of a defendant's entitlement to legal representation.  The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  The Sixth Amendment "[e]mbodi[es] a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself" and "safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding."  *Maine v. Moulton*, 474 U.S. 159, 169 (1985) (internal quotation marks omitted).  The Fifth Amendment acts as a shield against governmental efforts to curtail an individual's right to legal assistance.  The prophylactic effect of the Fifth Amendment promises that "no person . . . shall be compelled in any criminal case to be a witness against himself" and requires the police to inform a criminal suspect of his right to consult with an attorney before answering their questions.  Once a suspect invokes his Fifth Amendment right to consult with legal counsel, all police questioning must cease unless the suspect reinitiates communication.

The events that trigger the specific rights afforded by the Fifth and Sixth Amendments differ.  Because the Fifth Amendment stands as a potential barrier between an individual and police questioning, any custodial interrogation gives rise

to that protection.  *See Illinois v. Perkins*, 496 U.S. 292, 296 (1990); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  As the Fifth Amendment right prevents the police from compelling someone to make self-incriminating statements which he would not have freely made, its protections come into play during "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 458.  In the instant case, Maldonado enjoyed the full protection of the Fifth Amendment when interviewed by Officer Escalante, unless he waived those rights.

The Sixth Amendment, on the other hand, protects the rights of the "accused" in "all criminal prosecutions."  The Supreme Court in *Rothgery v. Gillespie County, Texas*, ___ U.S. ___, 128 S. Ct. 2578 (2008), recently reconsidered the question of when the Sixth Amendment right to counsel "attaches," that is, at what point the Constitution entitles a person to the help of a lawyer.  The *Rothgery* Court held that "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."  *Id.* at 2592.  Accordingly, "the first formal proceeding is the point of attachment" for purposes of the Sixth Amendment.  *Id.* at 2586.

The Supreme Court built the *Rothgery* decision on longstanding precedent.  The Supreme Court has firmly held that the Sixth Amendment by its own terms it does not

apply "until a prosecution is commenced." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). The Supreme Court has found that its protections begin with "'the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)); *see also Montejo v. Louisiana*, ___ U.S. ___, 129 S. Ct. 2079, 2085 (2009) ("[T]he Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings."). This rule is not "mere formalism," but honors the point at which "the government has committed itself to prosecute," "the adverse positions of government and defendant have solidified," and the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby*, 406 U.S. at 689.

Because the Sixth Amendment right does not become active until the commencement of prosecution, "[i]t cannot be invoked once for all future prosecutions[.]" *McNeil*, 501 U.S. at 175. The Sixth Amendment right to counsel is "offense specific," meaning it applies only "to the specific offense with which the suspect has been charged." *United States v. Carpenter*, 963 F.2d 736, 739 (5th Cir. 1992); *see also Texas v. Cobb*, 532 U.S. 162, 167-73 (2001); *McNeil*, 501 U.S. at 175. In other words, "a defendant's statements regarding offenses for which he ha[s] not been charged [are] admissible notwithstanding the attachment of his Sixth

Amendment right to counsel on other charged offenses." *Cobb*, 532 U.S. at 168.

Maldonado's Sixth Amendment right to counsel had attached to the bank robbery offense before his interrogation for the murder of Cruz Saucedo. A Texas court had appointed Mr. Gerard to safeguard Maldonado's interests in the bank robbery prosecution. The State of Texas, however, had not yet charged Maldonado with any crime relating to the murder. Accordingly, the police cannot have violated Maldonado's Sixth Amendment rights by interviewing him about the murder of Cruz Saucedo without legal counsel present; he had not yet been accused of committing that crime. The only questions are whether Maldonado invoked his right to have counsel present during interrogation about the murder and, if he did so, whether his mental retardation would make such waiver a nullity. Both questions are actionable under the Fifth Amendment. *See Montejo*, ___ U.S. ___, 129 S. Ct. at 2089-90 (observing that, in the absence of Sixth Amendment attachment, the Fifth Amended still protects a defendant's rights).

Maldonado alleges that he invoked his right to counsel before the April 25 interview. Maldonado claims that, when he ended the interview on April 24, "[t]here can be no doubt that it was 'sufficiently clear' to Officer Escalante that Maldonado was invoking his Fifth Amendment right to counsel at that time." (Doc. # 11 at 79). If a criminal suspect asserts his right to counsel, the police must end all questioning until an attorney is available or until the suspect reinitiates the interrogation. *See*

*Edwards v. Arizona*, 451 U.S. 477, 484-85 (1982).  This rule protects the suspect's rights and "prevent[s] police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

In *Davis v. United States*, 512 U.S. 452 (1994), however, the Supreme Court found that a suspect's invocation of the right to counsel cannot be ambiguous or equivocal in order to stop police questioning.  In particular, the *Davis* court found that the statement "Maybe I should talk to a lawyer" was not a sufficiently clear exercise of constitutional rights.   Accordingly, "the Constitution "do[es] not require the cessation of questioning" unless "the suspect . . . unambiguously request[s] counsel." *Davis*, 512 U.S. at 459.  Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil*, 501 U.S. at 178.

The testimony from the suppression hearing did not show any statement by Maldonado that could reasonably be construed as a request for counsel.  Maldonado told Officer Escalante that he would like time to think before giving a statement.  During the suppression hearing, Maldonado never testified that he asserted, and Officer Escalante ignored, a request to speak with Mr. Gerard or any other attorney.  The Fifth Circuit has elsewhere found that the comparable statement "Can I go back and think about it?" is ambiguous and does not prevent additional interrogation.  *See Hopper v. Dretke*, 106 F.App'x. 221, 232 (5th Cir. 2004).  Asking for time to think

before giving a statement is not such a clear invocation of Maldonado's Fifth Amendment rights that Officer Escalante should not have reinitiated questioning.

True, Officer Escalante testified: "That's what I thought he was going to do when we left [on April 24].  [G]et a hold of his attorney."  Tr. Vol. 18 at 38.  While Officer Escalante thought that Maldonado would speak with an attorney after the interview, the question is not what Officer Escalante understood or supposed, but whether Maldonado made an objectively clear invocation of his right to counsel.  *See Davis*, 512 U.S. at 459 ("To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry.").  Maldonado did not unambiguously ask to have an attorney with him during questioning.

Maldonado also argues that his mental retardation prevented him from knowingly or voluntarily waiving his right to have counsel present during interrogation.  Maldonado's claim, in part, depends on the outcome of his *Atkins* claim.  As previously discussed, the state courts were not unreasonable in finding that Maldonado was not a person with mental retardation.  Even so, the heart of this claim involves Maldonado's ability to comprehend the waiver of his rights.  In the suppression hearing, Maldonado testified that he did not understand what Officer Escalante told him.  Officer Escalante's testimony, however, did not give any reason to suppose that Maldonado could not understand the *Miranda* warnings, especially given Maldonado's previous interaction with the criminal justice system.  Importantly,

the record does not present facts to establish that the circumstances of the interrogation were such that coercion or overbearing would influence a person with impaired intelligence into confessing where he would not have otherwise.  The trial court explored the circumstances surrounding Maldonado's confession, though not explicitly in the context of mental retardation, and found that the police honored his constitutional rights.  Maldonado has not shown that the trial court should have ruled otherwise.

Maldonado has not shown any constitutional defect in the taking of his confession.  The Court will deny his Fifth and Sixth Amendment right to counsel claims.

## IV.    Right to Effective Legal Representation

Maldonado claims that his trial attorneys provided constitutionally ineffective assistance.  First, Maldonado faults trial counsel for failing to uncover, develop, and present evidence of his mental retardation.  Maldonado claims that evidence of his impaired mental capacity would have weakened the reliability of his confession in the guilt/innocence phase and provided valuable mitigation in the punishment phase.  Second, Maldonado faults trial counsel for not presenting additional mitigating evidence in the punishment phase, particularly that relating to his impoverished and abused childhood.  Finally, Maldonado claims that trial counsel should have acted on his foreign citizenship and sought help from the Mexican consulate.

Maldonado presented the first two arguments in his second successive state habeas application.  As previously discussed, the Court of Criminal Appeals dismissed those claims as an abuse of the writ.  Maldonado has not shown that he can overcome the resultant federal procedural bar.  Although the Court will dismiss those claims, in the interests of justice the Court will briefly address their merits.

Maldonado also did not raise his third argument, that trial counsel should have acted to preserve and promote Maldonado's Vienna Convention rights, properly in state court.  On direct appeal, Maldonado faulted the trial court for not instructing the jury to disregard his confession if taken in violation of his Vienna Convention rights.  In his first habeas action, Maldonado accused the State of Texas of ignoring his Vienna Convention rights.  Maldonado raised a claim in his second habeas application that trial counsel was deficient in developing mitigating evidence and exploring his mental retardation, but he did not mention the Vienna Convention.  In his third successive habeas application, Maldonado claimed that the violation of his Vienna Convention rights caused him to receive ineffective assistance because it left him with an inept trial attorney, but he did not fault the attorney who represented him for failing to champion his Vienna Convention rights.  While Maldonado raised similar issues in state habeas court, he never asserted that trial attorneys have a duty to assure the implementation of international treaty obligations.  Maldonado's third ineffective-assistance argument is, therefore unexhausted.  *See Ruiz v. Quarterman*, 460 F.3d 638,

643 (5th Cir. 2006) ("[I]n order for a claim to be exhausted, the state court system must have been presented with the same facts and legal theory upon which the petitioner bases his current assertions.").

The state courts would certainly apply TEX. CODE CRIM. PRO. art 11.071 § 5(a) to bar the latest nuance of Maldonado's repeated assertions of his Vienna Convention rights.  Adequate and independent procedural law forecloses federal review.  *See Nobles*, 127 F.3d at 420 ("A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'") (quoting *Coleman*, 501 U.S. at 734 n.1); *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (holding that when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review").  However, as with his other ineffective-assistance arguments, the Court will briefly address the merits of his complaints.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's

128

performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521. Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. In reviewing ineffectiveness claims "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Id.* at 689. An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689-90.[68]

---

[68]   Maldonado extensively argues that trial counsel's representation fell short of the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* ("Guidelines"). Recent Supreme Court precedent has relied on the Guidelines as a useful measure of what activities a reasonable attorney should engage in when
(continued...)

A petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 689; *Wiggins*, 539 U.S. at 534. The Court does not consider prejudice in a vacuum: "[i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

## A.   Failure to Investigate Mental Retardation

Maldonado claims that trial counsel failed to investigate his mental

---

[68]    (...continued)
representing a capital defendant. *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 524; *see also Strickland*, 466 U.S. at 688-89 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable"). Nevertheless,

> [n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract from the overriding mission of vigorous advocacy of the defendant's cause.

*Strickland*, 466 U.S. at 688-89. The Supreme Court has not held that the Guidelines are a checklist to effective representation. Guidelines established by professional organizations do not supplant, but rather inform, *Strickland*'s penetrating performance and prejudice inquiry. *See Wiggins*, 539 U.S. at 521; *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000).

impairments, ultimately hoping to prove that he was mentally retarded.  Respondent objects that Maldonado has not conclusively shown that he is mentally retarded, much less shown under the *Strickland* standard that trial counsel's failure to investigate mental retardation violated his constitutional rights.  As the Court has discussed fully with respect to the *Atkins* claim, the argument that Maldonado is mentally retarded is far from clear.  Maldonado has not shown that, had trial counsel sought professional assistance in determining his level of cognitive functioning, he could have raised a persuasive mental retardation case.

Even if he could have proven mental retardation, or even if evidence of Maldonado's low intelligence would serve the same purpose, Maldonado still has not made a sufficiently strong case for ineffective assistance.  Maldonado's claim targets trial counsel's representation at both the guilt/innocence and punishment phases.  Maldonado first asserts that trial counsel should have used mental retardation as a basis for showing that he did not comprehend the *Miranda* warnings, thus rendering his confession involuntary.   The trial court held a hearing to decide whether Maldonado waived his constitutional rights before confessing.  Trial counsel elicited testimony from Maldonado during the suppression hearing that questioned whether his low intelligence made him unable to waive his rights knowingly or voluntarily.  Maldonado testified that, before Officer Escalante began recording the interrogation, he repeatedly called Maldonado "stupid."  Tr. Vol. 18 at 66-67.  Trial counsel then

engaged Maldonado in a series of questions designed to undercut the audiotaped waiver of his rights.  As a result, Maldonado testified that Officer Escalante "told me some things very quickly, but I didn't even understand what he was telling me."  Tr. Vol. 18 at 65.  He explained: "I understood the words that he was telling me, but I didn't understand the consequences of what he was — what was going to come of it."  Tr. Vol. 18 at 66.  When asked if he understood his rights during the hearing, Maldonado stated: "Well, I cannot say I understand it perfectly, because there is [sic] a lot of words that I do not know or do not understand."  Tr. Vol. 18 at 66.

Maldonado's argument presupposes that trial counsel should have elicited more information about his low intelligence, most likely from mental health professionals such as those whose testimony supported his *Atkins* claim.  The record does not suggest that more information would have swayed the trial court to suppress Maldonado's confession.   In the suppression hearing, the trial court weighed Maldonado's testimony against the circumstances of the interrogation.   Officer Escalante testified that he had repeatedly informed Maldonado of his legal rights.  At trial, Officer Escalante testified that he read Maldonado his rights seven times before taking the statement.  Tr. Vol. 24 at 102.  Officer Escalante opined that Maldonado "[d]efinitely" understood his rights.  Tr. Vol. 18 at 22.  Maldonado was no stranger to the criminal justice system; he had previously served federal time and was then incarcerated on another charge.  Officer Escalante advised Maldonado of his rights on

132

April 24 and then left Maldonado all night to ponder whether to talk to the police. The transcript of the subsequent interview does not facially show that Maldonado had trouble understanding what he was told or suggest that Officer Escalante impermissibly influenced him.

Importantly, the trial judge had the opportunity to evaluate Maldonado's demeanor and assess his intellectual ability as he answered the attorneys' questions during the hearing.  Maldonado has not shown that expert testimony about mental retardation, especially when hotly disputed by the State's experts, would have persuaded the trial court that mental retardation invalidated the waiver of his rights. Maldonado has not shown a reasonable probability that, had trial counsel brought forth more evidence about Maldonado's low intelligence, the trial court would have suppressed the confession.

Maldonado also claims that trial counsel should have presented his mental retardation in the penalty phase as a means of mitigating against a death sentence. "Mental retardation as a mitigator and mental retardation under *Atkins* . . . are discrete legal issues."  *Bobby v. Bies*, ___ U.S. ___, 129 S. Ct. 2145, 2153 (2009); *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004) ("Borderline retardation is not always viewed as a mitigating circumstance.").  The decision a trial attorney faces when considering whether to present evidence of mental retardation in the penalty phase is difficult.  *Atkins* recognized that "reliance on mental retardation as a mitigating factor

133

can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. at 321; *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) ("Penry's mental retardation . . . is a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."). The Fifth Circuit has found that a trial attorney's decision not to present evidence of mental retardation as mitigating evidence can be reasonable in order to prevent a negative jury finding on issue of future dangerousness. *See Riley*, 362 F.3d at 306. Because Maldonado did not present this issue properly in state court, trial counsel has never given an affidavit or testimony that would show if the circumstances were such that they should have performed additional investigation into his mental capacity.

Nonetheless, no reasonable probability of a different result would flow from trial counsel's failure to argue during the punishment phase that Maldonado is mentally retarded. As the Court fully discussed with respect to the *Atkins* claim, Maldonado has not shown by a preponderance of the evidence that he is retarded. *See Boyd v. Johnson*, 167 F.3d 907, 910 (5th Cir. 1999) (finding no *Strickland* prejudice for failing to present a mitigating defense of mental retardation because of the conflicted nature of the evidence). The Fifth Circuit has previously found no *Strickland* prejudice in failing to present evidence of low IQ because "'the upper borderline of mild retardation' does not amount to 'any significant organic damage or

mental illness.'" *Riley*, 362 F.3d at 307 (quoting *Smith v. Black*, 904 F.2d 950, 977-78 (5th Cir. 1990)).  Also, *Strickland*'s prejudice prong requires the Court to place the evidence suggesting, though not conclusively proving, mental retardation in the context of Maldoando's trial.  As will be discussed more fully in the section that follows, Maldonado had a  violent and lawless history.  While low intelligence may have allowed the jury to find that Maldonado was (as suggested by the facts of the murder) a follower, that evidence also could have shown him to be a future danger when again encouraged by others to be violent.  The double-edged nature of the mitigating evidence would make it not reasonably probable that the jury would answer the special issues differently had trial counsel emphasized low intelligence in the punishment phase.  Even if not procedurally barred, this claim would not merit habeas relief.

### B.    Failure to Investigate Additional Mitigating Evidence

Maldonado claims that trial counsel erred by not presenting a broad mitigating case before the jury.  At the sentencing hearing, trial counsel called one witness, Maldonado's biological father.  Maldonado's father painted a bleak, but skeletal, picture of Maldonado's childhood, telling the jury of his birth to a prostitute, the detrimental effect her alcoholism had on his life, and other extenuating factors. Maldonado complains that trial counsel offered the jury an incomplete view into his life.  Since the finality of his conviction, he has assembled the testimony of many

witnesses who would more fully portray the depth of the poverty and neglect in which Maldonado was raised.  This sympathetic testimony shows that Maldonado suffered horribly as a child.

Respondent argues that trial counsel gave the jury an outline of Maldonado's background that the new details fill in, but do not fundamentally alter.   Also, Respondent asserts that the new evidence pales in comparison to the aggravating testimony at trial, particularly of Maldonado's prior lawlessness and violence in committing this murder.   In an unwavering line of cases, the Fifth Circuit has consistently refused to find prejudice when trial counsel presented similar mitigating evidence, even if only in outline form, at trial.  *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Rodriguez v. Quarterman*, 204 F.App'x 489, 501 (5th Cir. 2006); *Alexander v. Quarterman*, 198 F.App'x 354, 359-60 (5th Cir. 2006); *Parr v. Quarterman*, 472 F.3d 245, 257-58 (5th Cir. 2006).  Also, the Fifth Circuit "ha[s] construed [Supreme Court precedent] to require that an evaluation of *Strickland* prejudice include consideration of both the quantity and quality of the additional mitigating evidence." *Hood v. Dretke*, 93 F.App'x 665, 669 (5th Cir. 2004).[69]

---

[69]   A trial attorney's "failure to present mitigating evidence during the penalty phase is not per se ineffective assistance." *Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008).  After a reasonable investigation into potential defenses, an attorney may strategically decide not to call certain witnesses or present specific testimony.  Because Maldonado did not present this claim properly in state court, the record has not been developed as to whether trial counsel limited his punishment phase case through strategic decision-making or through

(continued...)

The consideration of mitigating evidence is a fact- and case-specific inquiry. Here, the prosecution presented a strong case for the death penalty that included significant evidence of Maldonado's lawlessness and violence. During the punishment phase, the prosecution emphasized the following circumstances in arguing for a death sentence:

- In November 1994, Maldonado and co-defendant Felix Rocha approached a security guard at a cantina, shot the guard several times, and stole his pistol and beeper. The guard died from his injuries.

- Maldonado entered a store with another man in February 1996, ordered the fifteen adults and children in the store to the ground, and stole approximately $2,000 from the store cashier.

- Maldonado robbed a bank in April 1996. Between 20 to 30 employees and customers were inside when Maldonado entered with another man. Both were armed. A bank surveillance tape recorded Maldonado jumping over the teller counter and taking money from the drawers. Maldonado and his accomplice fled with the cash, which included bait money. A police helicopter traced the getaway car. The occupants of the car fled on foot after stopping at a gas station. Maldonado took a hostage who had been pumping gas. Maldonado ultimately surrendered after a confrontation with the police.

- Maldonado served two-and-a-half years in federal prison for transporting marijuana.

On federal review, Maldonado has brought forth sympathy-generating

---

[69]  (...continued)
oversight. The Court does not have a record of why trial counsel presented only a limited punishment phase case.

testimony that the jury did not hear in its entirety.  Trial counsel presented the jury with Maldonado's background in a superficial fashion, leaving significant material underdeveloped.  Even had trial counsel presented the full picture of Maldonado's childhood, however, the jury would have had to consider the mitigating evidence against the murder in issue and Maldonado's lawless past.  The jury did not respond favorably to the outline of the mitigating evidence; it is not reasonably probable that the full picture would have swayed jurors into answering the special issues differently. Notwithstanding that the procedural posture of this case bars full federal consideration of this claim, the Court finds that Maldonado has not shown *Strickland* prejudice.

### C.     Failure to Investigate Maldonado's Mexican Citizenship

Maldonado faults trial counsel for not ensuring that the State of Texas honored his Vienna Convention rights.  Maldonado argues that, with consular assistance, his mental retardation would have been identified before trial and his additional mitigating evidence would have come before the jury.  In other words, had trial counsel contacted the Consulate, the Mexican government would have assured that an attorney did what he complains that trial counsel did not do.  As the Court has already noted, this allegation is speculative; the Mexican Consulate knew before trial that Maldonado was charged with capital murder yet did nothing.  Even so, at its heart this claim of ineffective assistance duplicates the other objections Maldonado raises to his trial representation.  His arguments for prejudice on this claim mirror the direct

138

allegations of ineffective assistance.  For the reasons discussed above, the Court is unpersuaded that Maldonado suffered prejudice from trial counsel's failure to assert vigorously Maldonado's Vienna Convention rights.

## V.    *Brady* **Claim**

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government must disclose all information favorable to the defense.  Maldonado claims that the trial court and the prosecution did not turn over information about official complaints made against Officer Escalante.  (Doc. # 11, Exhibit A).  Because of the number and nature of complaints made against him, Maldonado argues that Officer Escalante's "record as a police officer would cast doubt upon his testimony."  (Doc. # 11 at 129). Maldonado's *Brady* claim is procedurally barred and lacks merit.

Before trial, Maldonado requested that the prosecution turn over any favorable evidence.  Trans. at 70-73.  Maldonado also wished to subpoena records that would show any disciplinary complaints against Officer Escalante.  Trans. at 111.  The State in turn filed a "Motion to Quash Subpoena and Request for Protective Order."  Trans. at 121.  The State argued that police officer disciplinary records are confidential, but asked the trial court to review Officer Escalante's disciplinary records in chambers to decide if they contained any *Brady* material.[70]  The trial court considered the State's

---

[70]    Texas state law makes police personnel records confidential.  *See* Tex. Loc. Gov't Code Ann. § 143.089(g); Tex. Gov't Code Ann. § 552.008.  Texas case law allows for criminal
(continued...)

motion during a hearing. The defense informed the trial court that it sought "complaints or findings of true after hearing that Mr. Escalante had, had been involved in some misappropriation of evidence . . . in particular, confessions." Tr. Vol. 20 at 17. The trial court considered the "slender file from HPD" in chambers and found that "[t]here is absolutely nothing of that type in this file. Absolutely nothing." Tr. Vol. 20 at 17. Trial counsel commented: "I'm satisfied, Judge." Tr. Vol. 20 at 17. Maldonado then did not complain about the nondisclosure of the file on appeal or in state habeas court.

Maldonado did not present the state courts with any *Brady* claim involving Officer Escalante's disciplinary record. Texas' abuse-of-the-writ jurisprudence would prevent him from doing so in a fourth habeas application. As Maldonado has not shown that he can overcome the resultant procedural bar, this Court cannot consider its merits.

The Court, however, finds that he has not shown that his claim has a strong foundation. *See* 28 U.S.C. § 2254(b)(2) (allowing courts to deny unexhausted claims on the merits). Three essential elements compose a valid *Brady* claim: "'The evidence must be favorable to the accused, either because it is exculpatory, or because it is

---

[70]        (...continued)
        trial courts to make an *in camera* review of confidential information so as to provide defense
        counsel only with relevant, material information. *See Thomas v. State*, 837 S.W.2d 106, 111
        (Tex. Crim. App. 1992); *Dixon v. State*, 923 S.W.2d 161, 167 (Tex. App.–Fort Worth 1996),
        *vacated on other grounds*, 928 S.W.2d 564 (Tex. Crim. App. 1996).

impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  Maldonado has not shown that the information is helpful, in that it would have impeached Officer Escalante's testimony, or that it is material because prejudice resulted from its omission.  Maldonado provides an index of complaints against Officer Escalante. (Doc. # 2, Exhibit A).  Of the 32 entries in the complaint history index, most occurred well after Maldonado's trial ended in October 1997. Only six entries occurred before trial – three of those were categorized as "misconduct," two as "accident," and one as "los[s] of city propert[y]."  Maldonado does not provide the Court with any more information about these incidents.  The record only contains a list which shows the complaint filed, the date it was made, and the disposition of the complaint.  Those entries do not present enough detail to determine whether the evidence would be material, that is, whether a jury would have considered Officer Escalante to be an unbelievable witness because of the claims made against him.  Accordingly, Maldonado has not shown that Officer Escalante at the time of trial had a complaint history which would have seriously damaged his credibility before the jury.  The Court denies this claim.

## VI.   Due Process in the State Court's Denial of Relief

Maldonado also raises an unexhausted claim that the Texas Court of Criminal Appeals violated his rights under the Due Process Clause and the Eighth Amendment. Maldonado bases this claim on Dr. Denkowski's testimony in the state evidentiary hearing. Claiming that Dr. Denkowski's methodology was inconsistent with standard psychological practices for the diagnosis of mental retardation, Maldonado argues that the Texas courts' reliance on his testimony when denying habeas relief violated his constitutional rights.

The legal ground for this claim is unclear. To the extent that Maldonado criticizes the state court process, federal habeas provides a limited review of state court judgments. While Congress may restrict or expand the habeas writ, federal habeas relief has never been available to a petitioner merely because he disagrees with the reasoning of reviewing courts. Habeas relief is actionable "only on the ground that [an inmate] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). According to Fifth Circuit law, claims attacking an inmate's state habeas procedure are not cognizable on federal habeas review. *See Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005). "This is because 'an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself.'" *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (quoting *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001). The Court summarily

denies Maldonado's claim attacking the reasoning used by the state habeas court.

## CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Maldonado has not yet requested that this Court grant him a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when "[a petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Maldonado's claims. Under the appropriate standard, Maldonado has not shown that this Court should certify any issue for appellate consideration. This Court will not certify any issue for review by the Fifth Circuit.

## CONCLUSION AND ORDER

Maldonado's federal habeas petition has raised several important issues. As discussed above, Maldonado has not met the stringent showing required to merit procedural review and substantive relief with respect to his claim. Nonetheless, the Court recognizes and commends the extensive and dedicated work performed by Maldonado's attorneys in litigating his federal habeas claims. The Court sincerely appreciates the zealous representation provided by appointed counsel in this case.

For the reasons set forth above, the Court **GRANTS** Respondent's motion for summary judgment and **DENIES** Maldonado's petition for habeas corpus relief.  The Court will not certify any issue for consideration on appeal.

The Clerk will provide a copy of this Order to the parties.

**SIGNED** at Houston, Texas on _____, 2009.


_____
NANCY F. ATLAS
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGILIO MALDONADO, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-2984 |
| | § | |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## FINAL JUDGMENT

For the reasons stated in the Court's Order denying habeas relief and granting summary judgment in favor of Respondent, the Court **DISMISSES** this case **WITH PREJUDICE**.  The Court **DENIES** a Certificate of Appealability.

The Clerk will provide a copy of this Order to the parties.

**SIGNED** at Houston, Texas on September 24th, 2009.

_____
NANCY F. ATLAS
UNITED STATES DISTRICT JUDGE